**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DENIS RYSKAMP, Derivatively on Behalf of BOULDER GROWTH & INCOME FUND, INC.,

       Plaintiff,

v.

JOEL W. LOONEY,
DEAN L. JACOBSON,
RICHARD I. BARR,
SUSAN L. CICIORA and
JOHN S. HOREJSI,

       Defendants,

– and –

BOULDER GROWTH & INCOME FUND, INC.,

       Nominal Defendant.

---

**VERIFIED DERIVATIVE COMPLAINT FOR BREACH**
**OF FIDUCIARY DUTY AND UNJUST ENRICHMENT**

---

**INTRODUCTION**

1.      This is a shareholder derivative action brought by a shareholder of Boulder Growth & Income Fund, Inc. ("Boulder" or the "Company") on behalf of the Company against its entire Board of Directors for breach of fiduciary duty and unjust enrichment.

2.      Boulder's Board of Directors have and are continuing to breach their fiduciary duties by attempting to entrench themselves in their Board positions in order to continue to receive lucrative payments and income from Boulder.  Defendants' ongoing breaches of their fiduciary duties have caused and continue to cause great harm to Boulder and its shareholders.

**THE PARTIES**

3.      Plaintiff Denis Ryskamp has held shares of Boulder continuously since 2008. Plaintiff is a citizen of the State of Ohio.

4.      Nominal Defendant Boulder is a closed-end fund[1] with the stated objective (according to its website http://www.boulderfunds.net/BIF%20Objective.htm) of concentrating investment in real estate investment trusts ("REITs") and other registered closed-end income funds ("CIFs") (the "Objective").  Boulder is headquartered in Boulder, Colorado and was incorporated in Maryland in 1972.

---

[1]      A closed-end fund is a fund with a fixed number of shares outstanding, and one which does not redeem shares the way a typical mutual fund does.  Closed-end funds behave more like stock than open-end funds: closed-end funds issue a fixed number of shares to the public in an initial public offering, after which time shares in the fund are bought and sold on a stock exchange, and they are not obligated to issue new shares or redeem outstanding shares as open-end funds are.  The price of a share in a closed-end fund is determined entirely by market demand, so shares can either trade below ("at a discount") or above ("at a premium") the Net Asset Value ("NAV") of the fund.

5.      Director Joel W. Looney ("Looney") has been a director of Boulder since 2002.  As of the date of the filing of this Complaint, defendant Looney serves as Chairman of Boulder's Board. Defendant Looney has also been a director of Boulder's sister fund, Boulder Total Return Fund, Inc. ("BTF"), since 2001.  Defendant Looney is a citizen of the State of Kansas.

6.      Director Dean L. Jacobson ("Jacobson") has been a director of Boulder since 2006. Defendant Jacobson has also been a director of Boulder's sister fund, BTF, since 2004.  Defendant Jacobson is a citizen of the State of Arizona.

7.      Director Richard I. Barr ("Barr") has been a director of Boulder since 2002. Defendant Barr has also been a director of Boulder's sister fund, BTF, since 1999 and has served as Chairman of BTF's Board since 2003.  Defendant Barr is a citizen of the State of Arizona.

8.      Director Susan L. Ciciora ("Ciciora") has been a director of Boulder since 2006. Defendant Ciciora has also been a director of Boulder's sister fund, BTF, since 2001.  Defendant Ciciora is also a Trustee of the Lola Brown Trust No. 1B ("LB Trust") and the Ernest Horejsi Trust No. 1B (the "EH Trust").  Defendant Ciciora is a citizen of the State of Illinois.

9.      Director John S. Horejsi ("John Horejsi") has been a director of Boulder since 2004. Defendant Horejsi has also been a director of Boulder's sister fund, BTF, since 2006.  Defendant John Horejsi is a citizen of the State of California.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity between the plaintiff and the defendants and because the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the

11.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains a principal place of business in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## SUBSTANTIVE ALLEGATIONS

12.     Boulder is a closed-end fund with the stated objective of concentrating investment in REITs and other registered CIFs.  Boulder is headquartered in Boulder, Colorado and was incorporated in Maryland in 1972.

13.     The stockholders of Boulder approved a level-rate distribution policy on May 12, 2006, and Boulder's Board, pursuant to that approval, implemented a level-rate distribution policy on May 15, 2006, with the first monthly distribution being paid on May 31, 2006.  From May 2006 until November 2008, Boulder paid monthly distributions pursuant to the level-rate distribution policy.  According to Boulder's May 15, 2006 press release, the level-rate distribution policy was enacted "to provide a regular monthly distribution to its common stockholders which is not dependent on the amount of income earned or capital gains realized by the Fund."  According to Boulder, the level-rate of distribution was $1.20 per share, or 14.9% of Boulder's May 12, 2006 market price, on an annualized basis.

14.     Boulder's controlling shareholder is the EH Trust (the "Control Shareholder"), which, as of April 12, 2010, holds approximately 8,501,366 shares of Boulder stock, or a 33.3% interest in Boulder's outstanding stock.  Defendant Ciciora is a trustee of the EH Trust.

15.     Boulder is managed via co-advisory contracts with Boulder Investment Advisers, L.L.C. ("BIA") and Stewart Investment Advisers ("SIA").  SIA and BIA are paid a combined fee of 1.25% of Boulder's assets under management and split the advisory fees 75% to 25%.  Boulder is administered by Fund Administrative Services, LLC ("FAS") which is paid an annualized fee of 0.20% of Boulder's assets under management (together with the advisory fees collected by BIA and SIA, the "Fees").

16.     BIA is controlled by Evergreen Atlantic, LLC ("Evergreen Atlantic") and the LB Trust, each of which hold a 50% interest in BIA.  Stewart Horejsi and defendants Ciciora and John Horejsi are discretionary beneficiaries of the LB Trust and various Horejsi family-affiliated trusts which own Evergreen Atlantic.  The LB Trust and Evergreen Atlantic directly or indirectly benefit from the relationship between BIA and Boulder.

17.     SIA is wholly owned by the Stewart West Indies Trust, which was established by Stewart Horejsi in 1996.  Stewart Horejsi's children, defendants Ciciora and John Horejsi, are discretionary beneficiaries of the Stewart West Indies Trust, and directly or indirectly benefit from the relationship between SIA and Boulder.

18.     FAS is owned and controlled by Evergreen Atlantic and the LB Trust.  Stewart Horejsi and defendants Ciciora and John Horejsi are discretionary beneficiaries under the LB Trust and various Horejsi family-affiliated trusts which own Evergreen Atlantic, and directly or indirectly benefit from the relationship between FAS and Boulder.

19.     Stewart Horejsi is an employee of and investment manager for both BIA and SIA. Stewart Horejsi is also a beneficiary under and an investment adviser for the EH Trust.

20.     Defendants Ciciora and John Horejsi (the "Insiders") are Boulder directors and are Affiliates (defined by the Securities Exchange Act of 1934 as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified") of the Control Shareholder, BIA, SIA, and FAS.

21.     Under the above-referenced fee arrangements, BIA, SIA, and FAS (hereinafter collectively referred to as "Advisory Entities") and their Affiliates, the Insiders, benefit from increasing the assets under management at Boulder, as they collect the Fees, which are calculated as a percentage of Boulder's assets under management.

**Boulder's 2008 Rights Offering and Suspension of Distributions**

22.     The price of shares of closed-end income funds, or CIFs, is determined by analyzing the NAV of the fund.  The NAV of a CIF is established by deducting the total assets of the fund (the current market value of the securities held by the fund plus cash) from the total liabilities of the fund and dividing the result by the total number of outstanding shares.  When a share trades below the fund's NAV it is trading at a "discount" and when a share trades above the fund's NAV it is trading at a "premium."   From August 2006 until early 2008, Boulder's shares traded at a consistent premium to the fund's NAV.

23.     On February 20, 2008, Boulder's Board of Directors announced a rights offering (the "Rights Offering").  A rights offering is an offering of common stock to existing shareholders who hold subscription rights or pre-emptive rights that entitle them to buy newly issued shares, generally at a discount from the prevailing market price.

24.     On February 20, 2008, Boulder shares traded at a premium to NAV of 11.43%.

25.     On May 16, 2008, Boulder's Board issued a Prospectus related to the previously announced Rights Offering.  The Prospectus stated that the objective of the Rights Offering is to "produce both income and long-term capital appreciation by investing in a portfolio of equity and debt securities" (the "Rights Offering Objective").

26.     Prior to the Rights Offering, the EH Trust made the following sales of Boulder shares between mid-March and mid-April 2008:

| Transaction date | Number of shares sold | Share price | Total sale |
|---|---|---|---|
| 3/11/08 | 5,000 | $9.57 | $47,850.00 |
| 3/11/08 | 1,000 | $9.45 | $ 9,450.00 |
| 3/11/08 | 1,100 | $9.52 | $10,472.00 |
| 3/11/08 | 3,900 | $9.48 | $36,972.00 |
| 3/12/08 | 2,800 | $9.50 | $26,600.00 |
| 3/12/08 | 2,000 | $9.49 | $18,980.00 |
| 3/12/08 | 2,100 | $9.48 | $19,908.00 |
| 3/12/08 | 6,000 | $9.47 | $56,820.00 |
| 3/12/08 | 1,900 | $9.52 | $18,088.00 |
| 3/13/08 | 2,900 | $9.43 | $27,347.00 |
| 3/13/08 | 400 | $9.45 | $ 3,780.00 |
| 3/13/08 | 1,000 | $9.44 | $ 9,440.00 |
| 3/13/08 | 1,500 | $9.47 | $14,205.00 |
| 3/13/08 | 2,800 | $9.48 | $26,544.00 |
| 3/14/08 | 4,200 | $9.49 | $39,858.00 |
| 3/14/08 | 1,200 | $9.50 | $11,400.00 |
| 3/14/08 | 4,800 | $9.45 | $45,360.00 |
| 3/14/08 | 1,000 | $9.43 | $ 9,430.00 |
| 3/14/08 | 2,350 | $9.51 | $22,348.50 |
| 3/18/08 | 2,650 | $9.20 | $24,380.00 |
| 3/18/08 | 1,500 | $9.26 | $13,890.00 |
| 3/18/08 | 5,450 | $9.38 | $51,121.00 |
| 3/18/08 | 5,300 | $9.39 | $49,767.00 |
| 3/18/08 | 4,300 | $9.42 | $40,506.00 |
| 3/18/08 | 3,300 | $9.45 | $31,185.00 |
| 3/18/08 | 1,500 | $9.40 | $14,100.00 |
| 3/18/08 | 7,450 | $9.43 | $70,253.50 |
| 3/18/08 | 4,300 | $9.44 | $40,592.00 |

| Transaction date | Number of shares sold | Share price | Total sale |
|---|---|---|---|
| 3/19/08 | 5,190 | $9.25 | $48,007.50 |
| 3/19/08 | 2,110 | $9.27 | $19,559.70 |
| 3/19/08 | 3,600 | $9.30 | $33,480.00 |
| 3/19/08 | 1,157 | $9.20 | $10,644.40 |
| 3/19/08 | 3,643 | $9.22 | $33,588.46 |
| 3/19/08 | 1,200 | $9.21 | $11,052.00 |
| 3/20/08 | 5,000 | $9.10 | $45,500.00 |
| 3/20/08 | 3,467 | $9.00 | $31,203.00 |
| 3/20/08 | 5,133 | $8.98 | $46,094.34 |
| 3/20/08 | 400 | $8.99 | $ 3,596.00 |
| 3/20/08 | 900 | $9.07 | $ 8,163.00 |
| 3/20/08 | 5,000 | $9.12 | $45,600.00 |
| 3/20/08 | 4,000 | $9.15 | $36,600.00 |
| 3/20/08 | 1,400 | $9.14 | $12,796.00 |
| 3/24/08 | 200 | $9.14 | $ 1,828.00 |
| 3/24/08 | 3,400 | $9.12 | $31,008.00 |
| 3/24/08 | 3,400 | $9.05 | $30,770.00 |
| 3/24/08 | 600 | $9.13 | $ 5,478.00 |
| 3/24/08 | 3,500 | $9.02 | $31,570.00 |
| 4/16/08 | 1,800 | $8.74 | $15,732.00 |
| **Total Shares Sold** | 138,800 | **Total Sales** | $1,292,917.00 |

27.     Upon information and belief, Boulder made these sales in order to reap substantial profits based on the fact that Boulder shares were trading at a significant premium to the NAV.

28.     Boulder proceeded with the Rights Offering on June 20, 2008, and issued approximately 10,182,696 shares of equity at $7.48 per share for a total of $76,166,566.08.  These funds were to be invested into a "portfolio of equity and debt securities" pursuant to the Rights Offering Prospectus.

29.     The same day as the Rights Offering, June 20, 2008, Boulder's Control Shareholder, the EH Trust, purchased over 700,000 shares:

| **Transaction date** | **Number of shares purchased** | **Share price** |
|---|---|---|
| 6/20/08 | 683,322 | $7.48 |
| 6/20/08 | 115,036 | $7.48 |
| **Total Purchases** | 798,358 | |

30.     Shortly after Boulder's Rights Offering, on June 30, 2008, Doliver Capital Advisors, LP ("Doliver") surprised Boulder's Control Shareholder by filing a Schedule 13G with the SEC announcing it had amassed a 16.9% interest in Boulder's outstanding stock.

31.     Doliver's ownership of 16.9% of Boulder's outstanding stock was significantly larger than the EH Trust's 12.54% interest.  The EH Trust was, thus, no longer Boulder's majority shareholder.  As such, Doliver posed a significant challenge to the EH Trust for control of Boulder and the Fees derived by Affiliates of Boulder's Control Shareholder.

32.     Although it is an investment management company that does not hold stock itself, Doliver is perceived as a voting block commonly associated with several of its shareholders, including principals Ralph W. Bradshaw and Ronald G. Olin.

33.     After hearing the news that Doliver now had the largest interest in Boulder, Stewart Horejsi caused approximately $50,000,000 of the $76,166,466.08 raised by the Rights Offering (or approximately 1/3 of Boulder's portfolio) to be invested in cash equivalents guaranteed to under-earn Boulder's expense ratio.  These investments were in direct contradiction of the equity or debt securities investments required by Boulder's stated Objective and the nearly identical Rights Offering Objective.

34.     To make matters worse, four months later, on October 24, 2008, Boulder issued a press release announcing that Boulder's Board would consider the suspension of the level-rate distribution policy at its November 11, 2008 Board meeting.

- 8 -

35.     In an effort to regain control of Boulder, defendants caused $50 million of the $76,166,466.08 raised in the Rights Offering to be invested in cash equivalents, which would under-earn Boulder's expense ratio, but would increase the assets under management, resulting in increased Fees benefiting the Advisory Entities and their Affiliates, including the Insiders.

36.     In November 11, 2008, Boulder's Board announced that it had voted to suspend the Company's level-rate distribution policy and payment of monthly distributions for an indefinite period.  Upon information and belief, Boulder's Board suspended Boulder's level-rate distribution policy following the Rights Offering for two purposes: first, to fight the bid of shareholders affiliated with Doliver for control of Boulder, and second, to increase assets under management, thereby protecting and increasing the income earned by several directors via their interests in companies which collected Fees calculated as 1.45% of assets under management (including 1.45% of the $76,166,566.08 raised in the Rights Offering).

37.     One day after suspending Boulder's distributions, on November 12, 2008, Boulder's Board issued a press release indicating that it had "recently" received "two unsolicited shareholder proposals" from Ralph Bradshaw and Ron Olin, the principal two shareholders associated with Doliver.  These proposals involved electing alternative directors to Boulder's Board, terminating Boulder's co-advisory contracts with BIA and SIA, and continuing an aggressive level-rate distribution policy.

38.     By suspending distributions and thereby increasing the assets under management, Boulder's Board drove down the share price of Boulder stock, allowing its Control Shareholder – in which several directors hold a beneficial interest – to purchase stock at an artificially reduced price.

From the time Boulder's shares began trading at a discount in September 2008 through December 31, 2008, the EH Trust purchased 578,695 devalued shares totaling $2,475,000.00.

39.     At the end of November 2008, as a result of the Boulder Board's endorsement of the investment of more than $50,000,000 of the funds received from the Rights Offering, in contravention of Boulder's Objective and the Rights Offering Objective, and the Boulder Board's decision to suspend the level-rate distribution policy, both of which were done in order to block the bid of shareholders affiliated with Doliver to take control of Boulder, Boulder shares traded at a discount to NAV of 26.27%.

**The EH Trust's Trading Following Plaintiff's
Demand Upon Boulder's Board**

40.     At the end of July 2009, Boulder shares traded at a discount to NAV of 20.9%.

41.     Plaintiff demanded that Boulder's Board bring this derivative action by letters dated September 22, 2009; October 16, 2009; and October 29, 2009. In correspondence dated October 12, 2009, counsel for Boulder indicated that plaintiff's initial demand letter had been referred to Boulder's Board for consideration. In correspondence dated December 14, 2009, counsel for Boulder's Board indicated that the Board had convened a "Review Committee" to investigate the claims set forth in plaintiff's demand letters and that the Review Committee's investigation would continue until mid-January. Defendants Looney, Barr and Jacobson were on the Review Board.

42.     In correspondence dated December 17, 2009, plaintiff noted that the EH Trust was buying Boulder shares despite the fact that Boulder's Board had not made any disclosures about plaintiff's demand or the claims raised in his correspondence.

43.     On January 29, 2010, Boulder's Board responded to plaintiff's demand stating that the Review Committee had investigated the claims outlined in plaintiff's demand letters and declined to take legal action against those defendants or anyone else.

44.     Since plaintiff's initial demand on September 22, 2009, the EH Trust has continued damaging Boulder by purchasing 3,322,869 Boulder shares at the artificially discounted price of $19,347,132.00.

45.     Between September 2008 and the date this Complaint was filed, the EH Trust has purchased 5,307,834 Boulder shares for the artificially discounted price of $27,828,738.00 on the following dates and in the following amounts:

| Transaction Date | Number of shares purchased | Total purchase |
| --- | --- | --- |
| 11/14/08 | 135,254 | $578,000.00 |
| 11/19/08 | 33,793 | $130,000.00 |
| 11/24/08 | 17,833 | $71,000.00 |
| 11/26/08 | 22,300 | $91,000.00 |
| 11/28/08 | 48,200 | $206,000.00 |
| 12/1/08 | 5,472 | $22,000.00 |
| 12/3/08 | 12,500 | $52,000.00 |
| 12/4/08 | 16,400 | $68,000.00 |
| 12/5/08 | 26,000 | $108,000.00 |
| 12/8/08 | 55,798 | $249,000.00 |
| 12/9/08 | 57,666 | $260,000.00 |
| 12/11/08 | 14,500 | $63,000.00 |
| 12/12/08 | 10,300 | $43,000.00 |
| 12/15/08 | 24,300 | $103,000.00 |
| 12/16/08 | 37,354 | $162,000.00 |
| 12/17/08 | 11,200 | $50,000.00 |
| 12/19/08 | 30,900 | $136,000.00 |
| 12/29/08 | 18,925 | $83,000.00 |
| 1/15/09 | 19,700 | $88,000.00 |
| 1/16/09 | 18,200 | $84,000.00 |
| 1/20/09 | 15,300 | $68,000.00 |
| 1/21/09 | 7,100 | $32,000.00 |
| 1/22/09 | 4,000 | $18,000.00 |
| 1/23/09 | 17,300 | $76,000.00 |

| Date | Quantity | Amount |
|---|---|---|
| 1/26/09 | 8,100 | $36,000.00 |
| 1/27/09 | 22,100 | $98,000.00 |
| 1/28/09 | 5,500 | $25,000.00 |
| 1/29/09 | 16,300 | $73,000.00 |
| 1/30/09 | 3,900 | $17,000.00 |
| 2/23/09 | 18,310 | $69,000.00 |
| 2/24/09 | 16,600 | $64,000.00 |
| 2/27/09 | 1,000 | $3,840.00 |
| 3/2/09 | 7,500 | $27,000.00 |
| 3/3/09 | 35,300 | $123,000.00 |
| 3/5/09 | 28,500 | $97,000.00 |
| 3/9/09 | 90,760 | $308,000.00 |
| 3/10/09 | 72,465 | $254,000.00 |
| 3/11/09 | 15,500 | $57,000.00 |
| 3/13/09 | 12,199 | $46,000.00 |
| 4/29/09 | 12,200 | $53,000.00 |
| 4/30/09 | 34,764 | $152,000.00 |
| 5/1/09 | 5,600 | $24,000.00 |
| 5/4/09 | 7,400 | $33,000.00 |
| 5/5/09 | 21,000 | $94,000.00 |
| 5/6/09 | 20,060 | $89,000.00 |
| 5/7/09 | 18,000 | $79,000.00 |
| 5/8/09 | 8,828 | $40,000.00 |
| 5/11/09 | 48,000 | $215,000.00 |
| 5/12/09 | 55,100 | $243,000.00 |
| 5/13/09 | 25,300 | $108,000.00 |
| 5/14/09 | 96,967 | $422,000.00 |
| 5/15/09 | 71,940 | $315,000.00 |
| 5/18/09 | 37,121 | $166,000.00 |
| 5/19/09 | 49,227 | $221,000.00 |
| 5/20/09 | 89,075 | $399,000.00 |
| 5/21/09 | 10,900 | $48,000.00 |
| 5/22/09 | 25,840 | $115,000.00 |
| 5/26/09 | 23,200 | $105,000.00 |
| 5/27/09 | 54,011 | $241,000.00 |
| 5/28/09 | 14,280 | $64,000.00 |
| 5/29/09 | 5,000 | $22,850 |
| 6/1/09 | 41,800 | $196,000.00 |
| 6/2/09 | 21,250 | $98,000.00 |
| 6/4/09 | 25,000 | $117,000.00 |
| 6/5/09 | 15,243 | $71,000.00 |
| 6/9/09 | 4,100 | $19,000.00 |
| 6/10/09 | 11,926 | $56,000.00 |
| 6/12/09 | 15,000 | $70,000.00 |

| 6/15/09 | 18,180 | $84,000.00 |
| 6/16/09 | 8,600 | $39,000.00 |
| 6/29/09 | 2,425 | $10,936.00 |
| 6/30/09 | 684 | $3,078.00 |
| 7/1/09 | 21,000 | $96,000.00 |
| 7/2/09 | 31,549 | $142,000.00 |
| 7/13/09 | 5,000 | $22,250.00 |
| 7/14/09 | 73 | $327.00 |
| 7/15/09 | 5,000 | $23,000.00 |
| 7/16/09 | 4,967 | $22,798.00 |
| 7/17/09 | 5,000 | $23,400.00 |
| 7/31/09 | 26 | $127.00 |
| 11/3/09 | 4,800 | $25,872.00 |
| 11/4/09 | 13,000 | $70,000.00 |
| 11/6/09 | 20,000 | $109,000.00 |
| 11/9/09 | 9,000 | $50,000.00 |
| 11/10/09 | 45,600 | $251,000.00 |
| 11/11/09 | 44,237 | $246,000.00 |
| 11/12/09 | 200 | $1,106.00 |
| 11/13/09 | 41,651 | $231,000.00 |
| 11/16/09 | 27,769 | $157,000.00 |
| 11/17/09 | 63,747 | $356,000.00 |
| 11/18/09 | 36,900 | $210,000.00 |
| 11/19/09 | 37,400 | $213,554.00 |
| 11/19/09 | 47,700 | $272,000.00 |
| 11/20/09 | 20,408 | $115,000.00 |
| 11/23/09 | 105,490 | $604,000.00 |
| 11/24/09 | 12,957 | $73,000.00 |
| 11/25/09 | 84,167 | $480,000.00 |
| 11/27/09 | 10,000 | $56,000.00 |
| 11/30/09 | 40,800 | $229,000.00 |
| 12/1/09 | 125,100 | $708,000.00 |
| 12/2/09 | 36,049 | $204,000.00 |
| 12/3/09 | 53,000 | $300,000.00 |
| 12/4/09 | 92,362 | $522,000.00 |
| 12/7/09 | 89,103 | $506,000.00 |
| 12/8/09 | 62,682 | $356,000.00 |
| 12/9/09 | 111,491 | $633,000.00 |
| 12/10/09 | 57,586 | $328,000.00 |
| 12/11/09 | 24,020 | $137,000.00 |
| 12/14/09 | 27,108 | $155,000.00 |
| 12/15/09 | 20,500 | $118,000.00 |
| 12/16/09 | 26,600 | $153,000.00 |
| 12/17/09 | 71,032 | $407,000.00 |

| | | |
|---|---|---|
| 12/18/09 | 141,651 | $801,000.00 |
| 12/21/09 | 15,000 | $87,000.00 |
| 12/22/09 | 27,609 | $159,000.00 |
| 12/23/09 | 10,230 | $59,000.00 |
| 12/24/09 | 10,480 | $60,784.00 |
| 12/28/09 | 32,740 | $192,000.00 |
| 12/29/09 | 13,322 | $78,000.00 |
| 12/30/09 | 35,000 | $205,000.00 |
| 12/31/09 | 49,200 | $284,000.00 |
| 1/4/10 | 87,571 | $507,000.00 |
| 1/5/10 | 16,384 | $95,000.00 |
| 1/6/10 | 3,763 | $22,000.00 |
| 1/7/10 | 17,045 | $99,000.00 |
| 1/8/10 | 27,250 | $159,000.00 |
| 1/11/10 | 40,000 | $234,000.00 |
| 1/12/10 | 67,506 | $393,000.00 |
| 1/13/10 | 30,600 | $179,000.00 |
| 1/14/10 | 11,134 | $65,000.00 |
| 1/15/10 | 71,600 | $419,000.00 |
| 1/19/10 | 33,486 | $196,000.00 |
| 1/20/10 | 50,519 | $296,000.00 |
| 1/21/10 | 59,180 | $351,000.00 |
| 1/22/10 | 12,027 | $71,000.00 |
| 1/25/10 | 18,840 | $111,000.00 |
| 1/26/10 | 18,000 | $106,000.00 |
| 1/27/10 | 33,040 | $198,000.00 |
| 1/28/10 | 58,500 | $349,000.00 |
| 1/29/10 | 63,280 | $383,000.00 |
| 2/2/10 | 5,000 | $29,850.00 |
| 2/3/10 | 330 | $1,966.00 |
| 2/4/10 | 35,012 | $203,000.00 |
| 2/5/10 | 53,007 | $302,000.00 |
| 2/8/10 | 35,100 | $202,000.00 |
| 2/9/10 | 8,300 | $48,000.00 |
| 2/10/10 | 18,600 | $109,000.00 |
| 2/11/10 | 59,600 | $349,000.00 |
| 2/12/10 | 38,196 | $224,000.00 |
| 2/16/10 | 13,130 | $78,000.00 |
| 2/17/10 | 15,679 | $94,000.00 |
| 2/18/10 | 27,668 | $166,000.00 |
| 2/19/10 | 25,450 | $154,000.00 |
| 2/22/10 | 45,500 | $276,000.00 |
| 2/23/10 | 26,533 | $160,000.00 |
| 2/24/10 | 8,008 | $49,000.00 |

| | | |
|---|---|---|
| 2/25/10 | 10,797 | $65,000.00 |
| 2/26/10 | 10,713 | $65,000.00 |
| 3/1/10 | 14,100 | $87,000.00 |
| 3/2/10 | 37,780 | $235,000.00 |
| 3/3/10 | 33,650 | $209,000.00 |
| 3/4/10 | 24,900 | $155,000.00 |
| 3/5/10 | 22,000 | $138,000.00 |
| 3/8/10 | 18,406 | $116,000.00 |
| 3/9/10 | 4,900 | $31,000.00 |
| 3/10/10 | 14,485 | $93,000.00 |
| 3/11/10 | 28,900 | $184,000.00 |
| 3/12/10 | 54,949 | $353,000.00 |
| 3/15/10 | 31,026 | $199,000.00 |
| 3/16/10 | 30,800 | $198,000.00 |
| 3/22/10 | 14,000 | $89,000.00 |
| 3/23/10 | 5,759 | $37,000.00 |
| 3/24/10 | 13,640 | $87,000.00 |
| 3/25/10 | 19,535 | $125,000.00 |
| **TOTAL** | **5,307,834** | **$27,828,738.00** |

46.     Upon information and belief, the EH Trust purchases of Boulder stock were a result of (i) Boulder's shares trading at a steep discount to NAV resulting from the Board's endorsement of the investment of $50,000,000 of the Rights Offering proceeds in contravention of Boulder's Objective and the Rights Offering Objective, and (ii) the Boulder Board's decision to suspend Boulder's level-rate distribution policy.  The Board's decisions have enabled the EH Trust to accomplish its objectives of (i) retaining control of the Fees, (ii) buying out Doliver's shares of Boulder at a steep discount in order to defeat Doliver's challenge to the EH Trust for control of Boulder, and (iii) purchasing Boulder shares at a steep discount and subsequently selling the shares on the market for large gains after a liquidity event controlled by the Board, *i.e.* restoration of the distributions to shareholders.  While this plan benefits the objectives of the Insiders, it has come at the severe detriment of Boulder shareholders to whom the Board owes a fiduciary duty.  This in

effect is a rigged game to allow the Insiders to reap enormous benefits at the expense of shareholders.

## FIDUCIARY DUTIES OF BOULDER'S OFFICERS AND DIRECTORS

47.     To discharge their duties, defendants were required to exercise reasonable and prudent supervision over the management and financial affairs of Boulder.  By virtue of this obligation, these defendants were required to, among other things:

(a)     in good faith, manage, conduct, supervise, and direct the business and affairs of Boulder carefully and in good faith in accordance with state and federal laws and regulations and the articles and by-laws of Boulder;

(b)     exercise reasonable control and supervision over the officers and employees of Boulder;

(c)     exercise reasonable care and good faith in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by Boulder;

(d)     ensure that Boulder did not engage in unsafe, imprudent, or unsound practices and that Boulder complied with all applicable laws and regulations;

(e)     maintain a proper division of authority and responsibility among the officers and directors of Boulder so as to prevent the dominance of any officer or director in the conduct of the business and affairs of Boulder;

(f)     ensure that Boulder did not engage in unsafe, imprudent, or unsound practices and to become and remain informed as to how Boulder was, in fact, operating; and

(g)     supervise the preparation and filing of financial results and financial statements required by law from Boulder, including the Company's Reports on Form 10-K, and to

examine and evaluate any reports of examination, audits, or other information required by law concerning the financial condition of Boulder and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

**Breach of Fiduciary Duty – Rights Offering
and Suspension of Distributions**

48.     The November 11, 2008 press release announcing Boulder's suspension of distributions indicated that the Board was motivated by the overall decline in the stock market, which produced a number of attractively priced companies in which Boulder could prudently invest to allow shareholders to realize a better return than they would if Boulder continued to pay out distributions.

49.     But, instead of taking advantage of the market, Boulder invested more than $50,000,000, or approximately one-third of Boulder's portfolio and two-thirds of the funds received by Boulder from the Rights Offering, in cash equivalents, being short-term domestic government bonds and money market funds, which were guaranteed to under-earn Boulder's Fees and their own expense ratio. In addition, investing in cash equivalents was in direct contravention to Boulder's Objective and the Rights Offering Objective.

50.     Boulder's Board knew that purchases of these cash equivalents would keep the market price of Boulder shares at a large discount to NAV, and would facilitate the Control Shareholder's continual effort to purchase shares to protect the Advisory Entities' Fees, thereby benefiting the Insiders.

51.     Furthermore, while Boulder's Board entrenched itself by investing in such a way that ensured that Boulder's investments would under-earn the Advisory Entities' Fees and Boulder's expense coverage ratio while driving down the market price of Boulder shares (so that the Control

Shareholder could purchase shares at a depreciated price), it refused to provide shareholders relief in the form of distributions to restore market price or by buying back shares to return funds obtained from shareholders through the Rights Offering, which were not invested in accordance with the Rights Offering Objective.

52.    Boulder's November 11, 2008 press release announcing the suspension of distributions referred to Boulder's leverage coverage ratios as having been adversely impacted by the distribution policy and the decline in Boulder's NAV, despite the fact that Boulder's leverage coverage ratios were more conservative at the time of the distribution suspension than those of its peers.  They were also more conservative than when Boulder declared distributions prior to the 2008 Rights Offering announcement.

53.    Before the Rights Offering was announced in February 2008, Boulder shares traded at a premium to NAV of 11.43%.  Once it became apparent that defendants were going to ignore Boulder's Objective and the Rights Offering Objective contained in the Rights Offering Prospectus and instead invest more than $50,000,000 of funds obtained in the Rights Offering (approximately 1/3 of Boulder's portfolio) in cash equivalents guaranteed to under-earn the Advisory Entities' Fees and Boulder's expense coverage ratio while simultaneously suspending distributions in November 2008, Boulder shares traded at a discount to NAV of 26.27%.

54.    The drastic downswing resulted from several Board decisions that have not been in the best interests of shareholders, specifically the investment in cash equivalents guaranteed to under-earn Boulder's Fees and Boulder's expense coverage ratio and suspension of distributions.  To the contrary, these decisions have only benefited Boulder's Control Shareholder and its Affiliates, the Advisory Entities and their Affiliates, and the Insiders by increasing assets under management,

increasing the Fees to the Advisory Entities, thereby benefiting the Insiders, and permitting Boulder's Control Shareholder to purchase Boulder shares at a steep discount to defeat the efforts of Doliver to take control and terminate the Fee agreements with the Advisory Entities.

55.     Despite the significant decline in market price, Boulder's Board refused to return any money to Boulder's shareholders via a tender offer, demonstrating an interest in maximizing funds under management and benefiting the Advisory Entities and the Insiders by maximizing the increased Fees generated by the additional assets under management and increasing the discount to NAV to enable the Control Shareholder to purchase Boulder shares at a lower price, rather than maximizing shareholder value.

56.     As directors of a publicly held company whose common stock was, at all relevant times, registered with the SEC, defendants had a duty to promptly disseminate accurate and truthful information with respect to Boulder's publicly reported financial results and financial statements, products, management, earnings, and present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of Boulder, so that the market price of Boulder's stock would be based upon truthful and accurate information.

57.     By reason of their corporate positions and their ability to control the business and corporate affairs of Boulder at all relevant times, defendants owed Boulder fiduciary obligations of candor, good faith, and loyalty, and were required to use their ability to control Boulder in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Boulder and not in furtherance of their own personal interests.  In violation of their fiduciary duties, defendants caused Boulder to conduct its business in an unsafe, imprudent, and dangerous manner by pursuing unsound

**Breach of Fiduciary Duty – Driving Down Share Price
to Block Doliver and Purchasing Doliver Shares at a
Discount to the Detriment of Existing Shareholders**

58.     Upon information and belief, Boulder's Board suspended distributions and invested

more than $50,000,000 obtained through the Rights Offering in cash equivalents guaranteed to

under-earn the Advisory Entities' Fees and Boulder's expense coverage ratio, manipulating the price

of Boulder shares downward to enable the Control Shareholder to counter Doliver's block position

and retain its control position by rapidly purchasing shares at a dramatic discount from NAV.

59.     Since Boulder's shares began trading at a discount in September 2008, the EH Trust

has purchased 5,307,834 devalued Boulder shares totaling $27,828,738 increasing its interest in

Boulder from 12.54% to 33.3% of all outstanding Boulder stock in an effort to defeat the bid of

shareholders affiliated with Doliver to take control of Boulder and the Fees generated by Boulder.

60.     By reason of their corporate positions and their ability to control the business and

corporate affairs of Boulder at all relevant times, defendants owed Boulder fiduciary obligations of

candor, good faith, and loyalty, and were required to use their ability to control Boulder in a fair, just

and equitable manner, as well as to act in furtherance of the best interests of Boulder and not in

furtherance of their own personal interests.  In violation of their fiduciary duties, defendants caused

Boulder to conduct its business in an unsafe, imprudent, and dangerous manner by pursuing unsound

61.     As directors of a publicly held company whose common stock was, at all relevant times, registered with the SEC, defendants had a duty to promptly disseminate accurate and truthful information with respect to Boulder's publicly reported financial results and financial statements, products, management, earnings, and present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of Boulder, so that the market price of Boulder's stock would be based upon truthful and accurate information.

62.     Despite the adverse change in the market price premium/discount to NAV, Boulder's Board refused to return any money to Boulder's shareholders via a tender offer while retaining $50,000,000 in funds in cash equivalents under-earning the Fees and Boulder's expense coverage ratio, demonstrating an interest in maximizing funds under management and driving down the value of Boulder shares, thereby enabling the Control Shareholder to purchase devalued shares in order to retain control of Boulder and maximizing the Advisory Entities' Fees, benefiting the Control Shareholder, the Advisory Entities, and the Insiders, rather than maximizing shareholder value.

63.     The Boulder Board has breached its fiduciary duties by increasing managed assets through the Rights Offering while simultaneously failing and refusing to prudently invest the funds received through the Rights Offering and suspending distributions, driving down market price for the benefit of its Control Shareholder.

**Breach of Fiduciary Duty – Self-Dealing**
**Relating to Boulder Advisors**

64.     Defendants Ciciora and John Horejsi were Boulder directors at all times when

Boulder's Board endorsed the failure to prudently invest $50,000,000 in funds received from the

Rights Offering, instead investing those funds in cash equivalents guaranteed to under-earn the

Advisory Entities' Fees and Boulder's expense coverage ratio.

65.     The failure to prudently invest $50,000,000 in funds received through the Rights

Offering while simultaneously refusing to return the funds to shareholders via a tender offer, as well

as the suspension of Boulder's distribution policy, maximized the managed assets upon which the

Advisory Entities could draw the Fees, thereby benefiting the Insiders, while driving down market

price to permit the Control Shareholder to purchase shares at a discount and reducing shareholder

market value (vis-à-vis the market price of Boulder shares).

66.     Through their interests in the Advisory Entities, Stewart Horejsi and the Insiders

benefited from the decision to invest the $50,000,000 received through the Rights Offering in cash

equivalents and refusing to return the funds to shareholders via a tender offer.  Stewart Horejsi and

the Insiders also benefitted themselves over Boulder's shareholders through their decision to suspend

Boulder's distributions and maximize the amount of managed assets on which the Advisory Entities

could earn Fees while permitting Boulder's Control Shareholder to purchase shares at a discount.

67.     In April 2009, Stewart Horejsi stated that he did not believe that the market had yet

seen its bottom while still refusing to return the $50,000,000 in cash equivalents to shareholders,

equating to an admission that only the Advisory Entities (and, in turn, the Insiders) would continue

benefiting from the Board's decisions to (i) provide a Rights Offering, (ii) fail to prudently invest the

$50,000,000 in funds obtained through the Rights Offering in line with the Rights Offering

68.     By reason of their corporate positions and their ability to control the business and corporate affairs of Boulder at all relevant times, defendants owed Boulder fiduciary obligations of candor, good faith, and loyalty, and were required to use their ability to control Boulder in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Boulder and not in furtherance of their own personal interests.  In violation of their fiduciary duties, defendants caused Boulder to conduct its business in an unsafe, imprudent, and dangerous manner by pursuing unsound practices, including those specified in this Complaint.

69.     The Boulder Board has breached its fiduciary duties by maximizing assets under management instead of shareholder value, for the benefit of the Insiders who have an interest in the Advisory Entities, which draw advisory fees of 1.25% of Boulder's assets under management and an administrative fee of 0.20% of Boulder's assets under management.  These Insiders are also affiliated with the Control Shareholder, which took advantage of the drop in market price following the failure to invest the $50,000,000 in assets in other than cash equivalents and the suspension of Boulder's distributions in order to buy Boulder shares quickly and cheaply so as to retain its control position.  These acts and omissions by the defendants are not protected against liability by the business judgment rule.

70.     Despite the significant decline in market price and despite the fact that Boulder never invested the $50,000,000 in funds other than in cash equivalents, Boulder's Board refused to return any money to Boulder's shareholders via a tender offer, demonstrating an interest in maximizing

funds under management and benefiting the Advisory Entities and the Insiders, rather than maximizing shareholder value.

**Breach of Fiduciary Duty – The Board's Failure
to Disclose Demand**

71.    The failure of Boulder's Board to disclose plaintiff's demand and the claims outlined in his letters deprived shareholders from making Proposals relating to the claims (including termination of the Advisory Agreements with the Advisory Entities) at the annual shareholder meeting on December 7, 2009.

72.    The failure of Boulder's Board to disclose the demand and related claims in its proxy statements relating to the Horejsi group's bid for control of DWS RREEF Real Estate Fund I ("SRQ") and DWS RREEF Real Estate Fund II ("SRO"), through the Susan L. Ciciora Trust, which would have resulted in the reassignment of SRQ and SRO's advisory contracts to the Advisory Entities, prior to the annual shareholder meeting on December 7, 2009, was a material omission and contrary to the requirements of the securities laws.

73.    The Boulder Board failed to protect the Company against insider trading by the Control Shareholder based on material nonpublic information, specifically the claims set forth in plaintiff's demand.

74.    The Boulder Board's failure to disclose plaintiff's demand or the claims raised by his letters in Boulder's SEC filings violates both federal and state securities law.

75.    Upon information and belief, the EH Trust's purchases of Boulder stock were a result of (i) Boulder's shares trading at a steep discount to NAV resulting from the Board's endorsement of the investment of $50,000,000 of the Rights Offering proceeds in contravention of Boulder's Objective and the Rights Offering Objective, and (ii) Boulder Board's decision to suspend Boulder's

level-rate distribution policy.  The Board's decisions have enabled the EH Trust to accomplish its objectives of (i) retaining control of the Fees, (ii) buying out Doliver's shares of Boulder at a steep discount in order to defeat Doliver's challenge to the EH Trust for control of Boulder, and (iii) purchasing Boulder shares at a steep discount and subsequently selling the shares on the market for large gains after a liquidity event controlled by the Board, *i.e.,* restoration of the distributions to shareholders.  While this plan benefits the objectives of the Insiders, it has come at the severe detriment of Boulder shareholders to whom the Board owes a fiduciary duty.  This in effect is a rigged game to allow the Insiders to reap enormous benefits at the expense of shareholders.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

76.   Plaintiff brings this action derivatively in the right and for the benefit of Boulder to redress injury suffered and to be suffered by Boulder as a direct result of defendants' breaches of fiduciary duty and unjust enrichment.

77.   Plaintiff will adequately and fairly represent the interests of Boulder and its shareholders in enforcing and prosecuting its rights.

78.   Plaintiff is an owner of Boulder stock and was an owner of Boulder stock during times relevant to defendants' illegal and wrongful course of conduct alleged herein.

79.   By correspondence dated September 22, 2009, October 16, 2009 and October 29, 2009, plaintiff made demand upon Boulder's Board of Directors, but Boulder's Board refused to institute an action by Boulder against its directors to redress defendants' illegal and wrongful course of conduct alleged herein.

80.    In a letter dated January 29, 2010, Boulder's Board represented that the Review Committee had been convened when plaintiff's demand was received and had investigated the claims in plaintiff's demand between October 2009 and January 2010.

81.    In addition to refusing to bring suit, Boulder's Board also refused to provide any information relating to shareholder proposals that were received by Boulder so that plaintiff could review the Control Shareholder's purchases of Boulder stock in light of whether any proposals triggered the Control Shareholder's insider trading.

82.    By letter dated February 23, 2010, plaintiff again requested that Boulder's Board provide certain information and documents so that plaintiff could assess whether the investigation undertaken by the Review Committee was conducted independently, in good faith, and within the bounds of sound business judgment, including documents reviewed by the Review Committee, details relating to interviews conducted by the Review Committee, and any reports drafted by the Review Committee.

83.    Boulder's Board refused to provide any of the information or documents requested in plaintiff's February 23, 2010 letter.

84.    Upon information and belief, the members of the Review Committee, defendants Looney, Barr, and Jacobson, were not independent and improperly rejected plaintiff's demand for the following reasons:

(a)    The members of the Review Committee have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to stop their fellow directors and allies in the top ranks of Boulder from the violations of law complained of herein.  These are people they have developed professional relationships with and with whom they

(b)     The members of the Review Committee faced a significant likelihood of liability for participating in, approving and/or for permitting the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Boulder's stockholders or recklessly and/or consciously disregarded the wrongs complained of.  Pursuant to their specific duties as Board members, defendants are charged with the management of the Company and to conduct its business affairs.  Defendants breached the fiduciary duties that they owed to Boulder in that they failed to correct the actions that drove down the market price, prevented shareholders from recouping some share value by prudently investing the $50,000,000 obtained through the Rights Offering, and suspended distributions.  The members of the Review Committee could not exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing.

(c)     The members of the Review Committee have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent judgment in deciding whether to bring this action.

(d)     Based on the particularized facts above, to properly prosecute this lawsuit, Boulder's directors, including the members of the Review Committee, would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in civil liability and/or sanctions.  This they will not do.

(e)     Boulder's current and past directors may be protected against personal liability for their acts of mismanagement, waste, and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they may have caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Boulder.  However, due to certain changes in the language of directors' and officers' liability insurance policies, the policy covering the defendants in this case, including the members of the Review Committee, may contain provisions which eliminate coverage for any action brought directly by Boulder against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if the directors were to sue themselves or certain of the officers of Boulder, there would be no directors' and officers' insurance protection and thus, this is a further reason why the Review Committee would not recommend bringing such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage may exist and may provide a basis for the Company to effectuate a recovery.

(f)     To bring this action for breaching their fiduciary duties, the members of the Review Committee would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.

85.     Upon information and belief, the Review Committee failed to retain independent outside counsel to assist in the investigation of the claims contained in plaintiff's demand letters.

86.     Upon information and belief, the Review Committee failed to issue any reports detailing the steps it took to investigate the claims contained in plaintiff's demand letters, or how it

arrived at the decision to refuse plaintiff's demand to institute an action by Boulder against its directors to redress defendants' illegal and wrongful course of conduct alleged herein.

87.     The investigation undertaken by the Review Committee was an inherently flawed process that netted a flawed result – refusal to institute an action by Boulder against its directors to redress defendants' illegal and wrongful course of conduct alleged herein.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

88.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

89.     Defendants owed and owe Boulder fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe Boulder the highest obligation of good faith, fair dealing, loyalty, and due care.

90.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

91.     Each of the defendants caused the destruction of Boulder's market price after initiating the Rights Offering by failing to prudently invest the $50,000,000 obtained through the Rights Offering such that those funds would under-earn the Advisory Entities' Fees and Boulder's expense coverage ratio, which insured Boulder's market price would be driven down so the Control Shareholder could purchase depreciated shares to defeat the bid of shareholders affiliated with Doliver to take control of Boulder and to increase assets under management to increase the Advisory Entities' Fees, thereby benefiting the Insiders.  In addition, the defendants caused the destruction of Boulder's market price by suspending distributions in November 2008, which ensured that Boulder's

market price would be significantly decreased so the Control Shareholder could purchase its shares cheaper and at a depreciated value to defeat the bid of shareholders affiliated with Doliver to take control of Boulder.  These actions also caused Doliver's shareholders, as well as Boulder's other shareholders, to suffer severe losses in market price and sent a message to other shareholders, including those associated with Doliver, that Boulder's Board was willing to manipulate Boulder's stock price downward in order to injure anyone who attempted to take control of Boulder.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Boulder has sustained significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against All Defendants for Unjust Enrichment

93.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

94.     By their wrongful acts and omissions, each defendant was unjustly enriched at the expense of and to the detriment of Boulder.  The Insiders benefited directly or indirectly from the simultaneous increase of assets under management through the Rights Offering, failure to prudently invest $50,000,000 in line with the Objective and the Rights Offering Objective contained in the Rights Offering Prospectus to drive down market price so the Control Shareholder could purchase depreciated shares and increase assets under management to increase the Advisory Entities' Fees, thereby benefiting the Insiders, and suspension of distributions, which ensured that Boulder's market

price would be significantly decreased so the Control Shareholder could purchase its shares cheaper and at a depreciated value to defeat Doliver's takeover effort and to cause Doliver to suffer losses in its market price.

95.    Plaintiff seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all illicitly obtained proceeds obtained from their wrongful conduct, fiduciary breaches, and unjust enrichment as provided for by state law.

96.    Plaintiff, as a shareholder and representative of Boulder, seeks restitution and disgorgement of profits for the Company and hereinafter set forth.

97.    Upon information and belief, the EH Trust's purchases of Boulder stock were a result of (i) Boulder's shares trading at a steep discount to NAV resulting from the Board's endorsement of the investment of $50,000,000 of the Rights Offering proceeds in contravention of Boulder's Objective and the Rights Offering Objective, and (ii) Boulder Board's decision to suspend Boulder's level-rate distribution policy.  The Board's decisions have enabled the EH Trust to accomplish its objectives of (i) retaining control of the Fees, (ii) buying out Doliver's shares of Boulder at a steep discount in order to defeat Doliver's challenge to the EH Trust for control of Boulder, and (iii) purchasing Boulder shares at a steep discount and subsequently selling the shares on the market for large gains after a liquidity event controlled by the Board, *i.e.,* restoration of the distributions to shareholders.  While this plan benefits the objectives of the Insiders, it has come at the severe detriment of Boulder shareholders to whom the Board owes a fiduciary duty.  This in effect is a rigged game to allow the Insiders to reap enormous benefits at the expense of shareholders.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties, violations of law, and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder, including disgorging, attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Boulder has an effective remedy;

C.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.


DATED: April 14, 2010                          Respectfully submitted,


                                               s/ Kip B. Shuman
                                               Kip B. Shuman
                                               Rusty E. Glenn
                                               THE SHUMAN LAW FIRM
                                               885 Arapahoe Avenue
                                               Boulder, CO  80302
                                               Telephone:  30
                                               3/861-3003
                                               303/484-4886 (fax)
                                               Email: kip@shumanlawfirm.com
                                               Email: rusty@shumanlawfirm.com

                                               ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                               TRAVIS E. DOWNS III
                                               BENNY C. GOODMAN III
                                               655 West Broadway, Suite 1900
                                               San Diego, CA  92101
                                               Telephone:  619/231-1058
                                               619/231-7423 (fax)

Email: travisd@rgrdlaw.com
Email: bennyg@rgrdlaw.com

STATMAN, HARRIS & EYRICH, LLC
JEFFREY P. HARRIS
MELINDA S. NENNING
3700 Carew Tower
441 Vine Street
Cincinnati, OH 452025
Telephone: 513/621-2666
513/621-4896 (fax)
Email:jharris@statmanharris.com
Email: mnenning@statmanharris.com

APR-14-2010   15:04        Trimble Navigation                       937 233 7511    P.002

## VERIFICATION AND AFFIDAVIT

I, Denis Ryskamp, being duly cautioned and sworn, state that I have reviewed the foregoing

Verified Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment, and to the best

of my knowledge, information and belief, all the factual allegations set forth therein are true.

Denis Ryskamp

14-APR-2010