**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No.  10-cv-00842-WJM-KLM

DENIS RYSKAMP, Derivatively on Behalf of BOULDER GROWTH & INCOME FUND,

      Plaintiff,

v.

JOEL W. LOONEY,
DEAN L. JACOBSON,
RICHARD I. BARR,
SUSAN L. COCIORA, and
JOHN S. HOREJSI,

      Defendants,

and

BOULDER GROWTH & INCOME FUND, INC.,

      Nominal Defendant.

---

## ORDER ON MOTION TO COMPEL

---

      THIS MATTER is before the Court on Plaintiff's Motion to Compel Production of Court-Ordered Documents under Fed. R. Civ. P. 37(a) ("Motion to Compel"), ECF No. 110, filed on June 13, 2011.  For the foregoing reasons, the Motion to Compel is GRANTED in part and DENIED in part.

### BACKGROUND

      This is a shareholder derivative action brought by Denis Ryskamp ("Ryskamp" or "Plaintiff") on behalf of Boulder Growth and Income Fund, Inc. (the "Fund") and against the Fund's Board of Directors (the "Board"): Richard Barr ("Barr"), Susan Ciciora

("Ciciora"), John Horejsi, Dean Jacobson ("Jacobson"), and Joel Looney ("Looney"), for breach of fiduciary duty and unjust enrichment.  (Am. Compl., ECF No. 11 at ¶ 1.)

The following facts established in the record, unless otherwise noted, do not appear to be in material dispute.  The Fund is a closed-end fund with the stated objective of concentrating investment in real estate investment trusts and other registered closed-end income funds. (*Id.* at ¶ 4.)  Defendants are members of the Board.  (*Id.* at ¶¶ 5-9.)  The Fund is managed by Boulder Investment Advisers LLC ("BIA") and Stewart Investment Advisers ("SIA") (collectively the "Advisers"), which are paid a combined fee of 1.25 percent of the Fund's assets under management.  (*Id.* at ¶ 15.)  Stewart Horejsi ("Horejsi"), father to Defendants Ciciora and John Horejsi (collectively the "Interested Directors"), is an employee and investment manager for both BIA and SIA.  (*Id.* at ¶ 19.)

On February 20, 2008, the Board announced a rights offering of common stock to existing shareholders.  (*Id.* at ¶ 23.)  Shortly after the rights offering was completed in June 2008, Doliver Capital Advisors, L.P. ("Doliver"), a competing closed-end fund adviser, filed a Schedule 13-G with the Securities and Exchange Commission ("SEC") announcing that it was the Fund's largest shareholder, holding 16.9% of the outstanding stock.  (*See id.* at ¶¶ 30-31.)  Plaintiff alleges that after discovering that Doliver was now the Fund's largest shareholder, the Board and its advisers caused $50 million of the $76,166,466.08 raised in the rights offering to be invested in cash equivalents, increasing assets under management.  (*See id.* at ¶¶ 28, 35, 49.)  In November 2008, the Board suspended the Fund's level-rate distribution policy, which eliminated previously-paid monthly payments to shareholders.  (*Id.* at ¶ 52.)

Plaintiff alleges the level-rate distribution suspension and investment in cash equivalents caused the Fund's share price to drop.  (*Id.* at ¶ 53.)  Simultaneously with the Board's suspension of distributions, an entity known as the Ernest Horejsi Trust No. 1B ("EH Trust") allegedly began purchasing the allegedly artificially depreciated Fund shares in a bid to regain its control position.  (*Id.* at ¶ 45.)  Plaintiff alleges that the Fund's controlling shareholder is the EH Trust, and that Defendant Ciciora is a trustee of the EH Trust.  (*Id.* at ¶ 14.)  Plaintiff also alleges that Defendants Ciciora and John Horejsi are, among other things, Affiliates (as defined by the Securities Exchange Act of 1934) of the EH Trust. (*Id.* at ¶¶ 16-20.)  According to Plaintiff, the Board took aggressive action to drive down the share price of the Fund, so the EH Trust could purchase the Fund's stock at artificially reduced prices in order to fight off Doliver's bid for control.  (*Id.* at ¶ 50.)

On September 22, 2009, Plaintiff sent the Board a demand letter requesting that the Board institute an action by the Fund against its directors to redress the conduct Plaintiff later alleged in his Amended Complaint.  (*Id.* at ¶ 41.)  On December 14, 2009, counsel for the Board wrote that a Review Committee had been convened to review Plaintiff's demand.  (*Id.* at ¶ 41.)  The Review Committee members and the Fund were, and are, represented by Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"). (Dec. 14 Ltr., ECF No. 34-5 at 2.)  Defendants Barr, Jacobson, and Looney (the "Independent Directors") comprise the Review Committee.  (ECF No. 11 at ¶ 41.)  The Review Committee was granted full authority to act on behalf of the Board.  (Jan. 29 Ltr., ECF No. 34-8 at 2.)  On January 29, 2010, Paul Hastings issued a letter stating that the Review Committee had investigated Plaintiff's claims and decided not to take legal

action. (*Id.* at ¶ 43.)  On December 17, 2009, Plaintiff sent a letter requesting information about the Review Committee and the scope of its investigation.  (*Id.* at ¶ 42.)  On December 22, 2009, the Board refused to provide any of the information requested.  (Dec. 22 Ltr., ECF No. 34-7 at 2.)

On February 23, 2010, Plaintiff again requested that the Board provide certain information and documents pertaining to the content, manner and scope of the Review Committee's investigation.  (ECF No. 11 at ¶ 82.)  The Board again refused to provide any of the requested information.  (*Id.*)  Plaintiff then brought this action alleging claims for breach of fiduciary duty and unjust enrichment.  (*See* Compl., ECF No. 1.)

On June 25, 2010, Defendants filed a Motion to Dismiss pursuant to Rules 8(a), 12(b)(6), and 23.1 of the Federal Rules of Civil Procedure, claiming, *inter alia*, that Plaintiff failed to allege with requisite particularity that the Fund wrongfully refused his demand.  (ECF No. 32 at 2.)  Plaintiff filed a Motion to Stay Consideration of Defendants' Motion to Dismiss to Allow for Limited Discovery on the Independence and Investigation of the Review Committee ("Motion to Stay Consideration") on July 16, 2010.  (ECF No. 38.)  On September 14, 2010, Defendants filed Nominal Defendant Boulder Growth and Income Fund, Inc. and the Review Committee Members' Motion to Stay Discovery ("Motion to Stay Discovery") pending a ruling on their Motion to Dismiss. (ECF No. 54.)  Plaintiff wanted to proceed with discovery while Defendants wanted to stay discovery.  Defendants' Motion to Stay Discovery was granted, and Plaintiff's Motion to Stay Consideration was denied. (Order on Mots. to Stay, ECF No. 61.)

Finding that oral argument would assist the Court in the determination of Defendants' Motion to Dismiss, a hearing was held on April 13, 2011.  (Min. Entry for

-4-

Mtn. Hr'g, ECF No. 84.)  Defendants renewed their argument that Plaintiff did not plead

with sufficient particularity that demand was wrongfully refused and that the Review

Committee failed to act independently.  (*See* Order on Mtn. to Dismiss, ECF No. 85 at

5.)  The Court, however, found that this lack of factual specificity was due in large part

to Defendants' refusal to provide Plaintiff with information and documentation relevant to

the Review Committee's independence and the scope and content of its investigation.

(*Id.*)  The Court denied the Motion to Dismiss without prejudice to being re-filed, and

ordered Defendants to provide Plaintiff with initial disclosures required by Fed. R. Civ.

P. 26(a)(1)(A) and all information and documents sought in the February 23, 2010 letter

from Plaintiff's counsel to Defendants' counsel.  (*Id.* at 7-8.)

        In response to this Court's Order, Defendants provided Plaintiff with more than

11,000 pages of documents reviewed by the Review Committee, Rule 26(a)(1) Initial

Disclosures, the 51-page report of the Review Committee's investigation, and a 25-page

privilege log.  (ECF No. 127 at 2.)  On June 13, 2011, Plaintiff filed a Motion to Compel

Production of Court-Ordered Documents Under Fed. R. Civ. P. 37(a), seeking

production of those documents withheld by Defendants and set forth in Defendants'

privilege log.  (ECF No. 107). This matter is now before the Court.


**LEGAL STANDARD**

        "A shareholder derivative suit is governed by the law of the state of

incorporation."  *Bender v. Schwartz*, 917 A.2d 142, 151 (Md. Ct. Spec. App. 2007).  The

parties agree that the Fund's state of incorporation is Maryland.  Under Maryland law, a plaintiff in a derivative action must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile. *Bender v. Schwartz*, 917 A.2d 142, 152 (Md. Ct. Spec. App. 2007), citing *Kamen v. Kemper Fin. Svcs. Inc.*, 500 U.S. 90, 96 (1991); *Waller v. Waller*, 187 Md. 185, 192 (1946).  After demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded action is in the best interests of the corporation. *Bender v. Schwartz*, 917 A.2d at 152.  If the board fails to take the action demanded following an investigation, the shareholder may sue on behalf of the corporation. *Id.*  The shareholder may defeat a motion to dismiss by showing the board did not act independently or demand was wrongly refused. *Id.*

To determine whether demand was wrongly refused, the court reviews the board's investigation under the business judgment rule, which calls for deference to the board unless the plaintiff can show that the investigation was not conducted independently and in good faith, or that the board's decision was not within the realm of sound business judgment. *Id.*  Plaintiff has the burden of setting forth facts to rebut the presumption that the board acted reasonably and in the corporation's best interests. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  "A stockholder must show more than mere suspicion and must state a claim in particular, rather than conclusory terms." *Bender*, 917 A.2d at 152-53.  Plaintiff's pleading burden for establishing wrongful refusal of his demand is higher than that required under Rule 8. *Burns v. Friedli*, 241 F. Supp. 2d 519, 525 (D. Md. 2003).  Rule 23.1 requires a Plaintiff "state with particularity" the facts of the case. Fed. R. Civ. P. 23.1(b)(3).

The Order on Defendants' Motion to Dismiss allowing for limited discovery was intended to provide a clearer picture of whether the Review Committee's investigation into Plaintiff's demand was properly conducted under a reasonable application of the business judgment rule to the facts of this case.

## DISCUSSION

This present dispute arises from Defendants' refusal to produce all of the Court-ordered documents referenced above, including records of interviews conducted, e-mail correspondence, "Confidential Memoranda", and other information purportedly relied upon by the Review Committee during its investigation of Plaintiff's claims. Defendants claim that they have properly withheld some of the documents within the description of documents ordered by this Court to be produced on the basis of the attorney-client privilege and application of the work product doctrine. (ECF No. 128.) In his Motion to Compel, Plaintiff argues for the production of all documents withheld by Defendants (ECF No. 107).

## I.    Attorney-Client Privilege

Plaintiff points out that many of the withheld communications include Horejsi and/or other non-attorney employees of the Fund or the Advisers ("Multi-Party Communications"). As a result, Plaintiff argues the attorney-client privilege does not apply because these communications extend beyond Paul Hastings and its clients, the Fund and the Independent Directors. (ECF No. 107 at 9-10.) Defendants, however, argue these communications are necessary for the purpose of operating the Fund because any advice given by Paul Hastings to the Fund or the Independent Directors must also be communicated to the Advisers and the Interested Directors for the advice

to be effectuated.  (ECF No. 127 at 10.)[1]

In a diversity matter such as this where the case is based on a state cause of action, state law controls the determination of the attorney-client privilege.  *White v. American Airlines, Inc.*, 915 F.2d 1414, 1424 (10th Cir. 1990).  In Colorado, the attorney-client privilege is "established by the act of a client seeking professional advice from a lawyer and extends only to confidential matters communicated by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations."  *People v. Tucker*, 232 P.3d 194, 198 (Colo. App. 2009) (citing *Losavio v. Dist. Court in and for Tenth Judicial Dist.*, 533 P.2d 32, 35 (Colo. 1975)).  Communications between attorney and client are protected to "facilitate[] the full development of facts essential to proper representation of a client."  *Alliance Constr. Solutions, Inc. v. Dep't of Corr.*, 54 P.3d 861, 864 (Colo. 2002) (citation omitted).  The privilege applies only to communications under circumstances giving rise to a reasonable expectation that the communications will be treated as confidential.  *Tucker*, 232 P.3d at 198 (citing *Wesp v. Everson*, 33 P.3d 191, 197 (Colo. 2001)).  The attorney-client privilege encompasses confidential communications made by the client to an attorney, and communications from the attorney to the client.  *Shriver v. Baskin-Robbins Ice Cream Co., Inc.*, 145 F.R.D. 112, 114 (D. Colo. 1992) (citing *People v. Tippett*, 733 P.2d 1183 (Colo. 1987)).

---

[1] Attached to this Order is a Court-Annotated Privilege Log.  On this Court-Annotated Privilege Log, each document at issue in the Motion to Compel has been numbered from 1 to 243 to aid in accurately identifying such documents in this Order.  As best the Court can determine, Plaintiff here contests the applicability of the attorney-client privilege to the following documents: 1, 2, 11-35, 37-73, 75-108, 111-68, 170-210, 213, 215-22, 224-27, 230-31.

The application of the attorney-client privilege presents certain problems in the context of a corporation as client.  While the attorney-client privilege applies to corporations, a corporation cannot speak directly to its lawyers.  *See Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981); *Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 462 (Colo. App. 2003).  Because "a corporation can only act through its officers, directors, agents, and employees, . . . communications between corporate counsel and company personnel are privileged so long as they concern matters within the scope of the employees' corporate duties."  *Shriver*, 145 F.R.D. at 114 (citing *Upjohn*, 449 U.S. at 394-95); *accord Genova*, 72 P.3d at 462.  Such privileged communications remain privileged even when a corporate agent shares the communication with another agent charged with acting on such issues.  *Genova*, 72 P.3d at 462 (citing *Shriver*, 145 F.R.D. at 114).

In *Alliance Construction Solutions*, the Colorado Supreme Court created a four-part test to determine whether a communication between a corporation's counsel and an officer, director, agent, or employee is privileged: (1) the communication must be with "an employee, agent, or independent contractor with a significant relationship not only to the [corporate] entity but also to the transaction that is the subject of the [corporate] entity's need for legal services"; (2) the entity "must demonstrate that the communication was made for the purpose of seeking or providing legal assistance"; (3) "the entity must show that the subject matter of the communication was within the scope of the duties provided to the entity by its employee, agent, or independent contractor"; and (4) the entity "must show that the communication was treated as confidential and only disseminated to those persons with a specific need to know its contents."  *Alliance*

-9-

*Constr. Solutions*, 54 P.3d at 869-70.

In *Alliance Construction Solutions*, the court addressed the issue of whether communications between an independent contractor and counsel to a governmental entity were privileged. *Id.* at 867. Following the four-part test, the court found that the independent contractor had a significant relationship to the project at issue and the governmental entity asserting the privilege; the purpose of the communication was to gain or provide legal assistance; the subject matter was within the independent contractor's duties; and the communication was shown to have been treated as confidential. *Id.* at 870-71. Therefore, the court held that such communication was privileged. *Id.* at 871.

Here, Plaintiff contests the application of the attorney-client privilege as applied to (1) communications by Paul Hastings or other outside counsel where Horejsi, the Interested Directors, or other non-attorney employees of the Fund were present; (2) communications by and between Paul Hastings and the Adviser Counsel where Horejsi or the Interested Directors are present; (3) communications by and between the Advisers' counsel and/or Horejsi's counsel (Stephen Miller ("Miller") and Joel Terwilliger ("Terwilliger")) (the "Adviser Counsel") and Advisers; and (4) communications where no attorneys were present.[2] (ECF No. 107 at 9.)

In determining whether the Multi-Party Communications are protected by the

_____

[2] In his Motion to Compel, Plaintiff also contests Defendants' claim of attorney-client privilege as applied to communications by the Adviser Counsel which were disclosed to the Fund ("Adviser Documents"). (ECF No. 107 at 9.) However, pursuant to the parties' Stipulated Motion for Entry of Second [Proposed] Protective Order Pursuant to Federal Rule of Evidence 502(d), ECF No. 129, and the subsequently-issued protective order, ECF No. 132, Plaintiff has withdrawn its Motion to Compel with respect to these Adviser Counsel Documents.

attorney-client privilege, the Court begins by considering the relationship between the parties.  In review of the August 2, 2011 Privilege Log ("Aug. 2 Privilege Log"),[3] the Court notes that the individuals participating in the allegedly privileged communications are Fund management, the Fund's compliance officer, the Interested Directors, Horejsi, Adviser portfolio managers, and Adviser Counsel.  (Aug. 2 Privilege Log, ECF No. 143-2.)  The Court finds that each of these parties has a significant relationship to the Fund.  It cannot be reasonably disputed that the Fund, as an inanimate entity, must act through its agents.  *Genova*, 72 P.3d at 462.  In this regard, the Fund's management, compliance officer, and all directors, including the Interested Directors, clearly have the duty to act for the Fund.  Similarly, the Fund is managed by the Advisers, which serve as independent contractors to the Fund and are necessary for the management of the Fund.  Horejsi and other Adviser portfolio managers are responsible for investing the Fund's assets, implementing investment strategy, and managing day-to-day transactions.  (Zwickel Decl., ECF No. 127-8 at ¶ 7.)  The Adviser portfolio managers were very closely involved with the management and investment decisions of the Fund and the issues involved in this litigation.  Similarly, the Advisers Counsel were relied on by the Adviser portfolio managers to ensure regulatory and other compliance issues involving the Fund's investments, they communicated with the Fund's counsel, and were involved in decisions which are the subject of this litigation.  (*See Id.* at ¶¶ 6-7.)

---

[3] This version of the privilege log was filed with the Court as Exhibit B to Defendants' Response to Plaintiff's Notice of Clarification Re: Documents Produced to Plaintiff Pursuant to a Federal Rule of Evidence 502(d) Protective Order.  (ECF No. 143.)  This privilege log is updated from the privilege log filed as Exhibit A to Plaintiff's Motion to Compel, and does not include the Adviser Documents recently provided by Defendants following the entry of the Second Protective Order, ECF No. 132.

Accordingly, the relationship between the Fund, Fund management, the Fund's compliance officer, the Interested Directors, Horejsi, Adviser portfolio managers, and Adviser Counsel satisfies the first prong of the *Alliance Construction Solutions* test.  54 P.3d at 869-70.

Second, the Court looks to whether the communications were made for the purpose of seeking or providing legal assistance.  *Id.* As the Supreme Court noted in *Upjohn*, corporations "constantly go to lawyers to find out how to obey the law."  449 U.S. at 392 (quotation omitted).  Here, a declaration submitted by Paul Hastings counsel indicates that the Fund management, the Fund's compliance officer, the Interested Directors, Horejsi, Adviser portfolio managers, and Adviser Counsel regularly served as contacts for the Fund's counsel, and followed the advice of the Fund's counsel on many of the issues related to the rights offering and investment of the subsequent profits which are at issue in this litigation.  (*See* Zwickel Decl., ECF No. 127-8.)  The Aug. 2 Privilege Log further indicates that the parties discussed the rights offering compliance issues, SEC Rules, and other compliance issues with the Fund's counsel in managing the Fund.  (ECF No. 143-2.)

Further, there are instances on the Aug. 2 Privilege Log where Paul Hastings was not a participant in the communication, but advice given by Paul Hastings was discussed.  Colorado courts recognize that "[a]n otherwise privileged communication by a lawyer to a corporate agent does not lose its protected status simply because the agent then conveys the attorney's opinion to corporate management charged with acting on such issues."  *Genova*, 72 P.3d at 462.  Here, a declaration submitted by Paul Hastings counsel indicates that communications not listing counsel from Paul Hastings

or other attorneys as parties to said communications indeed involved the conveyance of underlying legal communications by Paul Hastings.  (Carlton Decl., ECF No. 127-1 at ¶ 13.)  The Court notes that the description of such communication on the Aug. 2 Privilege Log clearly indicates that the parties were discussing legal advice provided by Paul Hastings.  Because the parties associated with the contested communications are each charged with the management of the Fund, the Court finds that communications regarding legal advice provided by Paul Hastings to an agent or officer within the scope of corporate duties does not destroy the communication's protected status.  The Court further finds that those communications either directly with Paul Hastings or which discussed advice given by Paul Hastings[4] regarding the rights offering and related compliance issues satisfy the second prong of the *Alliance Construction Solutions* test.[5]

Third, the Court looks to whether the subject matter of the communication was within the scope of the duties provided to the entity by its agents.  *Alliance Construction Solution*, 54 P.3d at 869-70.  As discussed above, the Fund management, the Fund's compliance officer, the Interested Directors, Horejsi, Adviser portfolio managers, and Adviser Counsel are all tasked with ensuring that their management of the Fund complies with the law.  This regulatory compliance with respect to the rights offering and subsequent investment of the profits was the topic of conversation for many of the communications between Paul Hastings and the parties at issue, as well as between

---

[4] As noted on the Aug. 2 Privilege Log, ECF No. 143-2.

[5] As best the Court can determine, with regard to the second step of the *Alliance Construction Solutions* test, the Court finds that the following contested documents contain a description giving rise to a *prima facie* claim of attorney-client privilege: 1, 2, 11-35, 37-73, 75-87, 111, 115-19, 121-22, 124, 136-42, 144-68, 170-74, 177-210, 213, 215-22, 224-27, 230-31.

the parties at issue in discussion amongst each other regarding advice from Paul

Hastings.[6]  Thus, the third prong of the *Alliance Construction Solutions* test is satisfied.

54 P.3d at 869-70.

Finally, the Court looks to whether the communications were treated as

confidential.  Through declaration, Defendants' counsel indicates that counsel

understood the Fund management, the Fund's compliance officer, the Interested

Directors, Horejsi, Adviser portfolio managers, and Adviser Counsel served as

representatives of the Fund for purposes of communicating facts necessary to provide

competent legal assistance.  (Zwickel Decl., ECF No. 127-8 at ¶ 8.)  Counsel stated that

such communications were made with an expectation of confidentiality and that those

communications would remain subject to the attorney-client privilege.  (*Id.* at ¶ 7.)

Further, and most importantly on this point, the Court does not have evidence to the

contrary.  Therefore, the fourth prong of the *Alliance Construction Solutions* test is

satisfied.  54 P.3d at 869-70.

Accordingly, with respect to the Multi-Party Communications here contested by

Plaintiff, the Court finds the attorney-client privilege applies to these communications

despite the inclusion of the Fund management, the Fund's compliance officer, the

Interested Directors, Horejsi, Adviser portfolio managers and Adviser Counsel in  these

communications.  The Court thus finds that the following communications are protected

by the attorney-client privilege and their production to Plaintiff will not be compelled: 1,

---

[6] The following documents appear to be subject to attorney-client privilege under the *Alliance Construction Solutions* test: 1, 2, 11-35, 37-73, 75-87, 111, 115-19, 121-22, 124, 136-42, 144-68, 170-74, 177-210, 213, 215-22, 224-27, 230-31.

2, 11-35, 37-73, 75-87, 111, 115-19, 121-22, 124, 136-42, 144-68, 170-74, 177-210, 213, 215-22, 224-27, 230-31.

### A.    Common Interest Doctrine

In Colorado, the common interest, or joint defense, doctrine is an alternate approach to address the exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to third parties.  *See Black v. Southwestern Water Conservation Dist.*, 74 P.3d 462, 469 (Colo. App. 2003) (citing *Wesp*, 33 P.3d at 197).  "Communications shared with third persons who have a common legal interest with respect to the subject matter thereof will be deemed neither a breach nor a waiver of the confidentiality surrounding the attorney-client relationship." *Id.*  The common interest doctrine includes pre-existing confidential communications and documents that are shared during a common enterprise.  *Id.*; *see also Ritter v. Jones*, 207 P.3d 954, 960 (Colo. App. 2009).  "The privilege applies only to communications given in confidence and intended and reasonably believed to be part of an on-going and joint effort to set up a common legal strategy." *Black*, 74 P.3d at 469 (citations omitted).

### *Paskowitz Litigation*

Within communications reviewed by the Review Committee are communications relating to a shareholder derivative suit concerning the Fund's 2007 rights offering (the "Paskowitz Litigation").[7]  (ECF No. 107 at 6.)  Plaintiff argues the common interest

---

[7] The following communications are related to the Paskowitz Litigation: 88-114, 120, 123, 125-134, 143, 169, 175-76, 211.

doctrine within the attorney-client privilege does not apply to communications regarding the Paskowitz Litigation because the Review Committee was to conduct an independent investigation into potential misdeeds of the Board and the Interested Directors.  (*Id.* at 18.)

Defendants argue the Paskowitz Litigation was a purported class action seeking injunctive relief and did not involve any investigation or demand for an investigation. (ECF No. 127 at 13 n.19.)  Thus, Defendants argue the common interest privilege protects these communications relating to strategies for a joint defense of the case. (ECF No. 127 at 13.)

Through declaration, Defendants' counsel attests that the co-defendants and their counsel in the Paskowitz Litigation communicated with an expectation of confidentiality and a further expectation that those communications would remain subject to the attorney-client privilege.  (Zwickel Decl., ECF No. 127-8 at ¶ 4.) The emails at issue here occurred during the litigation involving the Review Committee, the Advisers, and the Interested Directors as co-defendants.  (*See id.*)  Significantly, plaintiff is without any evidence that would rebut this showing.  As such, the communications were exchanged among co-defendants and concerned a joint defense.  Accordingly, with respect to communications relating to the Paskowitz Litigation, the Court finds the attorney-client privilege applies to these communications.  Thus, the Court finds that the following documents related to the Paskowitz Litigation are protected by the attorney-client privilege and their production to Plaintiff will not be compelled: 88-114, 120, 123, 125-134, 143, 169, 175-76, and 211.

***Board Meeting Minutes***

Also among the communications reviewed by the Review Committee are minutes from Board meetings.[8]  These minutes have been reviewed by Defendants, and provided in redacted forms to Plaintiff.  (Aug. 2 Privilege Log, ECF No. 143-2.)  To the extent Plaintiff opposes application of the attorney-client privilege to these communications, Plaintiff argues the common interest doctrine does not apply because the communications include the Independent and Interested Directors.  (*See* ECF No. 107 at 16-19.)  However, as with the analysis above regarding the Paskowitz Litigation, the Court finds that these communications are privileged due to the common interest of all parties to formulate a common legal strategy regarding regulatory compliance issues.  Accordingly, with respect to communications redacted from regular and special Board meetings, the Court finds the attorney-client privilege applies to these communications.  As a consequence, the Court finds that the following redacted communications from minutes from Board meetings are protected by the attorney-client privilege: 3-10, 36, 74, 109-110, 169, 211-212, 214, 223, 228-29, 232-34, and 243.

## B.    Crime-Fraud Exception

Plaintiff argues that while the attorney-client privilege may apply, certain documents are not protected based on the crime-fraud exception.  (ECF No. 107 at 10.)  Plaintiff alleges that Horejsi, as an adviser to the Fund, manipulated the timing of the rights offering so that he could use his insider knowledge to make a personal profit at shareholder expense.  (*Id.*)  Further, Plaintiff alleges that the Adviser Counsel assisted

---

[8] As best the Court can determine, the following communications are minutes from Board meetings: 3-10, 36, 74, 109-110, 169, 211-212, 214, 223, 228-29, 232-34, 243.

in this alleged fraud.  (*Id.*)  Plaintiff asks the Court to compel production of all communications dated October 2007 through June 2008 where Horejsi is a participant and the description of the communication relates to either rights offering compliance or share sale compliance.  (*Id.*)[9]

Defendants argue that Plaintiff lacks probable cause on which to base his claims. (ECF No. 127 at 18.)  Defendants allege that all of the Fund's stockholders acquired and disposed of the Fund's stock during the 2007 and 2008 rights offerings, and that there is no evidence that Horejsi traded his securities on the basis of material, non-public information.  (*Id.*)

In Colorado, the attorney-client privilege gives way when the communications between a client and attorney are made for the purpose of aiding the commission of a future crime or a present continuing crime.  *A. v. Dist. Court of Second Judicial Dist.*, 550 P.2d 315, 324 (Colo. 1976) (citation omitted).  This limitation was extended to cases involving civil fraud in *Caldwell v. District Court in and for City & County of Denver*, 644 P.2d 26 (Colo.1982) and is now known as the "crime-fraud" exception to the attorney-client and work product privileges.

Application of the crime-fraud exception requires "a prima facie showing that the exception applies to each document before the document is actually stripped of its privilege and admitted into evidence."  *A. v. Dist. Court*, 550 P.2d at 326.  To invoke the exception, the party opposing the privilege has the burden to present a prima facie showing of "facts 'adequate to support a good faith belief by a reasonable person that

_____

[9] As best the Court can determine, in this regard Plaintiff is requesting the Court compel documents 206, 208, 213, 215-217, 219-221, 225-227.

wrongful conduct sufficient to invoke the crime or fraud exception to the attorney-client privilege has occurred.'" *People v. Tucker*, 232 P.3d 194, 199 (Colo. App. 2009) (quoting *Caldwell*, 644 P.2d at 33); *see also Wesp*, 33 P.3d at 200 n.16 ("[t]he party asserting that the privilege is pierced by the crime-fraud exception must make a prima facie showing that provides a foundation in fact for the assertion of ongoing or future criminal conduct."). Thus, the movant "must at least demonstrate probable cause to believe that a crime or fraud has been attempted or committed and that the communication was in furtherance thereof." *Tucker*, 232 P.3d at 200 (citing *In re Richard Roe*, 68 F.3d 38, 40 (2d Cir.1995)).

In *Tucker*, the court held that where the defendant admitted to forging a district attorney's signature and where there was evidence that the defendant impersonated the district attorney to gain a benefit by deceitfully attempting to influence a judge in a criminal case, there was probable cause to believe defendant was attempting to commit or committing a crime or fraud. *Tucker*, 232 P.3d at 200. In *Tara Woods*, however, the court held there was not probable cause to believe defendant was attempting to commit or committing a crime or fraud where the plaintiff relied on mere conclusory allegations. *Tara Woods Limited Partnership v. Fannie Mae*, No. 09-cv-00832-MSK-MEH, 2010 WL 3322709, at *3 (D. Colo. Aug. 19, 2010).

Here, Plaintiff's allegations provide facts, which if true, would cause a reasonable person to believe wrongful conduct has occurred. Plaintiff alleges a pattern whereby Fund Advisor Horejsi communicated with his personal attorney and Adviser Counsel Miller and with Adviser Counsel Terwilliger to manipulate the timing of rights offerings in order to allow Horejsi affiliates to sell Fund shares in advance of the 2008 rights offering

-19-

at a premium price, purchase a greater number of Fund shares at net asset value during the rights offering, then resell the shares again at a premium price following the rights offering.  (*See* Harris Decl., ECF No. 135-1 at ¶ 6.)

Plaintiff further alleges that Horejsi communicated with Miller and Terwilliger in order to have inside knowledge of and control over the timing of the 2008 rights offering. (*Id.*) These allegations are supported in considerable detail by communications already in Plaintiff's possession indicating that Horejsi and Terwilliger were attempting to manipulate the date of the rights offering for Horejsi's maximum benefit.  (BIF008194, BIF010816, ECF No. 107-3.) Moreover, it is undisputed that Horejsi, as an Adviser, profits from management of the Fund's assets, and his children are members of the Board.  The motivation for Horejsi to act in the manner alleged by Plaintiff is thus amply present. Finally, while the current complaint does not directly assert a claim of fraud against Defendants, following the limited discovery ordered by the Court on April 15, 2011, Plaintiff has indicated an intent to file a second amended complaint to include a claim sounding in fraud against one or more Defendants.  (ECF No. 135 at 10.)

Because Plaintiff's allegations are supported in the record through information from initial disclosures and through counsel declaration, the Court finds that Plaintiff has met his burden in demonstrating "probable cause to believe that a crime has been attempted or committed" necessary to invoke the crime-fraud exception to the attorney-client, common interest, and work product privileges.  *See, e.g., Tucker*, 232 P.3d at 200.  The Court therefore orders that the following documents be produced to Plaintiff: 206, 208, 213, 215-217, 219-221, 225-227.

### C.  Fiduciary Exception

Plaintiff argues that, as a shareholder of the Fund, the directors owe a fiduciary

duty to him, and with this fiduciary duty comes a right to access that communication

between the Fund and Paul Hastings.  (ECF No. 107 at 12-13.)  Plaintiff further argues

that because the Court must determine whether the Review Committee's demand

refusal was made in good faith, there is good cause for overcoming the attorney-client

privilege.  (*Id.* at 13-14.)

Defendant argues that Plaintiff cannot show good cause to overcome the

attorney-client privilege  (ECF No. 127 at 14.)  Defendants further argue that Plaintiff

lacks standing to assert the fiduciary exception for communications prior to becoming a

shareholder on December 20, 2007.  (*Id.* at 15-16.)

Where the client is a corporation, and the party seeking disclosure of a

communication between an attorney and the corporation is a shareholder of that

corporation, Colorado law looks to the fiduciary exception to the attorney-client privilege.

*See Neusteter v. Dist. Court for the City and County of Denver*, 675 P.2d 1, 5 (Colo.

1984).  Noting that [t]he attorney-client privilege still has viability for the corporate

client," the Colorado Supreme Court has held that

> where the corporation is in suit against its stockholders on charges of acting
> inimically to stockholder interests, protection of those interests as well as those of
> the corporation and of the public require that the availability of the privilege be
> subject to the right of the stockholders to show cause why it should not be
> invoked in the particular instance.

*Neusteter*, 675 P.2d at 5-6 (quoting *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-04

(5th Cir. 1970).  Thus, shareholders are given access to otherwise privileged

information upon a showing of good cause.  *Gerrits v. Brannen Banks of Florida, Inc.*,

138 F.R.D. 574,  (D. Colo. 1991) (quoting *Ward v. Succession of Richard W. Freeman*,

-21-

854 F.2d 780 (5th Cir. 1988)).

In *Garner*, the Fifth Circuit addressed the issue of attorney-client privilege in relation to shareholder derivative suits.  430 F.2d at 1093.  The *Garner* court emphasized the "fundamental principle that the public has the right to every man's evidence," and that disclosing otherwise privileged information involves "a balancing of interests between injury resulting in disclosure and the benefit gained in the correct disposal of litigation."  430 F.2d at 1100.  The court then identified the following factors, which the Colorado courts have adopted, for use in determining whether good cause exists to waive the privilege in favor of shareholders:

> [T]he number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is action criminal, or illegal but not criminal, or of doubtful legality; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has in interest for independent reasons."

*Garner*, 430 F.2d at 1104.

Applying the *Garner* factors to this case, a significant factor, and for this Court, the dispositive one, is that Plaintiff owns only approximately 141.111 shares of the Fund, corresponding to less than one percent of Fund stock.[10]  The Court acknowledges that Plaintiff's discovery requests are limited to information and documents relating to

---

[10] This is based on a letter sent to Paul Hastings by Plaintiff on October 16, 2009 indicating that at that time, Plaintiff owned 141.111 shares of stock.  (ECF No. 34-3 at 2.)  While the Court does not have information on the exact percentage of shares Plaintiff owns, the Court extrapolated the percentage based on the fact that on April 12, 2010, the EH Trust owned 8,501,366 shares of Fund stock, corresponding to 33.3% ownership.  (ECF No. 11 at ¶ 14.)

the Review Committee's demand refusal, which can be provided only by Defendants.

Nonetheless, Defendants have already provided 11,000 pages of documents reviewed

by the Review Committee in its investigation, and will be providing further documents

pursuant to this Order.

The *Garner* factors provide considerations for the Court to use in balancing the

interests of the parties.  430 F.2d at 1100.  Here, Plaintiff is a minority stockholder still

attempting to get beyond the motion to dismiss stage of litigation.  In these

circumstances, the Court finds that the interests of justice are best served by not

allowing a blanket fiduciary exception to the attorney-client privilege.  It is simply not

enough that the information requested by Plaintiff can only come from Defendants or

that the request for information is in some respects limited in scope. The attorney-client

privilege serves an important role in our system of justice, and the Court finds that

Plaintiff has not made a showing sufficient to warrant a wholesale application of the

fiduciary exception to the attorney-client privilege at this juncture of the litigation.

## II.    Interview Memoranda

Plaintiff asserts that the Interview Memoranda[11] drafted by Paul Hastings

following interviews of members of the Board, officers of the Fund, and senior

employees/officers of the Fund and its Advisers regarding the 2008 rights offering

should be produced.  (ECF No. 107 at 7.)  Plaintiff argues that because Paul Hastings

orally communicated summaries of the Interview Memoranda to the Review Committee,

any privilege was waived.  (*Id.* at 7-8.)  Defendants argue the Interview Memoranda are

---

[11] The Interview Memoranda are documents 235-242 on the Court-Annotated Privilege
Log.

working papers containing summaries of counsel's mental impressions of the interviews and should be privileged under the work product doctrine.  (ECF No. 127 at 7-9.)

"Unlike the attorney-client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3)." *Frontier Refining Inc. v. Gorman-Rupp Co., Inc.*, F.3d 695, 702 n.10 (10th Cir. 1998) (internal quotation omitted).  The work product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial . . . [unless] they are otherwise discoverable under Rule 26(b)(1); and the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A).  "At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."  *United States v. Nobles*, 422 U.S. 225, 238 (1975).

"Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts contained within work product."  *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) (citation omitted).  A party may still discover documents that contain fact work product by satisfying the substantial need or undue burden test.  Fed. R. Civ. P. 26(b)(3)(A)(ii); *Frontier Ref.*, 136 F.3d at 704 n.12. However, opinion work product, such as an attorney's mental impressions, conclusions, opinions, or legal theories, receives special protection against disclosure.  Fed. R. Civ. P. 26(b)(3)(B) ("If the court orders discovery of these materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a

party's attorney or other representative concerning the litigation.").

In considering whether, at this stage in the litigation, discovery of Defendants' Interview Memoranda is appropriate, the Court looks to *Weiser v. Grace*, 683 N.Y.S.2d 781 (N.Y. Sup. Ct. 1988). In *Weiser*, as here, the court had allowed limited discovery in order to determine the reasonableness and good faith of a special litigation committee's ("SLC") factual investigation. (*Id.*) at 785. The court found that "[i]n order for plaintiffs to reasonably challenge the thoroughness of the SLC's factual investigation, they must be able to examine the questions posed and the subjects explored in the witness interviews." *Id.* Likewise, the court found that it was unable to decide on the underlying reasonableness of the SLC without review of the factual record underlying the recommendation. *Id.* The court ordered production of notes, summaries and outlines regarding interviews, following an *in camera* review. *Id.* at 786.

Similarly, in *Peller v. The Southern Co.*, the court found that limited discovery was necessary in order to enable the plaintiff to challenge the thoroughness of an independent litigation committee's investigation. No. 1:86-CV-975-RCF, 1988 WL 90840, at *3-4 (N.D. Ga. March 25, 1988). The *Peller* court emphasized that the conduct of the interviews was important in evaluating the depth of the factual investigation. *Id.* The court thus ordered production of notes taken by the review committee members during interviews. *Id.* at *4.

The Court finds that any underlying facts within the Interview Memoranda are not privileged under the work product doctrine. Further, while the Court has held that Plaintiff has not shown good cause under the *Garner* factors for a blanket waiver of the attorney-client privilege, the Court does find that there is a substantial need for Plaintiff

-25-

to have access to the Interview Memoranda in order to determine the scope and breadth of the Review Committee's investigation.  This information cannot be produced through any other means.  Fed. R. Civ. P. 26.  Through review of the Interview Memoranda, Plaintiff, and the Court, will be able to best determine the vigor with which the Review Committee pursued its duty to investigate Plaintiff's demand.

The Court recognizes that portions of the Interview Memoranda may contain privileged information immune from discovery regardless of their relevance to the good faith and reasonableness of the Review Committee's investigation.  Accordingly, an *in camera* review is appropriate to ensure that those privileges are not violated.  An *in camera* review will protect against disclosure of the mental impressions, conclusions, opinions or legal theories of Paul Hastings in preparing the Interview Memoranda.  *See FDIC v. United Pacific Ins. Co.*, 152 F.3d 1266, 1276 n.6 (10th Cir. 1998).  Accordingly, Defendant is ordered to produce to Chambers for an *in camera* review by the Court, the Interview Memoranda which are Docs. 235-242 in the Court-Annotated Privilege Log.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Plaintiff's Motion to Compel, ECF No. 107, is GRANTED in part, DENIED in part, and HELD IN ABEYANCE in part as follows:

1)      Plaintiff's Motion to Compel with regard to documents excluded from the attorney-client privilege pursuant to the crime-fraud exception is GRANTED.  Defendants shall produce to Plaintiff all such documents in their entirety;

2)      Plaintiff's Motion to Compel with regard to the Interview Memoranda is

HELD IN ABEYANCE.  Defendants shall produce to Chambers, on or before September 7, 2011, unredacted copies of the Interview Memoranda which remain in dispute as discussed in Part II above; and

3)     Plaintiff's Motion to Compel with regard to all other documents listed on the Aug. 2 Privilege Log is DENIED.

Dated this 1st day of September, 2011.

BY THE COURT:

William J. Martinez
United States District Judge