UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 10-CV-00842 WJM-KLM

DENIS RYSKAMP, Derivatively on Behalf of
BOULDER GROWTH & INCOME FUND, INC.,

      Plaintiff,

v.

JOEL W. LOONEY, *et al.*,

      Defendants,

  and

BOULDER GROWTH AND INCOME FUND, INC.,

      Nominal Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS SUSAN L. CICIORA'S AND JOHN S. HOREJSI'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 8(a), 9(b), and 12(b)(6)**

**I.      INTRODUCTION**

The Third Amended Verified Stockholder Derivative Complaint ("TAC") does not allege that any of the directors of the Boulder Growth and Income Fund LLC (the "Fund") committed any intentional or reckless misconduct.  Rather, the TAC alleges that defendants Susan L. Ciciora ("Ciciora") and John S. Horejsi ("J. Horejsi") (collectively, the "Interested Director Defendants") as well against the disinterested director

defendants, Joel Looney, Richard Barr and Dean Jacobson (collectively the "Disinterested Directors," and with the Interested Directors, the "Director Defendants") failed (i) to fully investigate the reasons behind the 2008 rights offering; (2) to investigate Stewart Horesji and the entities relating to the Fund's advisors; and (iii) to invest the funds raised by the 2008 rights offering in accordance with the Fund's investment objectives. (*See, e.g.,* TAC, ¶ 259.) While Plaintiff alleges in conclusory fashion that these actions were undertaken "intentionally or recklessly," Plaintiff alleges no facts to support any indicia of intent on behalf of the Director Defendants. Plaintiff's allegations against the Director Defendants are essentially that they did not detect the purported plans of the Fund's advisors and their employees to manipulate the share prices to their benefit. Such claims fail as a mater of law.

As a threshold matter, the TAC lumps all of the defendants' together in terms of their liability, without pleading any specific wrongful act against any specific Director Defendant. The Fund's Charter contains an exculpation clause for each of its directors. (Review Committee's Request for Judicial Notice ("RJN"), Ex. C at 9–10.) The exculpation clause places a heightened burden on Plaintiff to allege conduct establishing that each named director **personally** (1) received an improper benefit or (2) displayed "active and deliberate dishonesty" material to the cause of action. *See* MD. CODE ANN., CTS. & JUD. PROC. § 5-418(a)(1)-(2). The TAC, however, makes no attempt to allege that the Director Defendants approved or otherwise caused these transactions in a bad faith manner or for a fraudulent purpose. Instead, Plaintiff alleges the Board was misled in connection with these transactions by the Fund's co-investment

advisers. Such "lack of oversight" claims do not give rise to liability against any Director Defendants.

## II.   ARGUMENT

### A.   The Exculpation Clause in the Fund's Charter Requires Dismissal of the Claims Asserted by Plaintiff

Under Maryland law, a corporation may limit the liability of its directors to the corporation or its stockholders under all relevant circumstances, other than those involving the actual receipt of "an improper benefit or profit" and the "active and deliberate dishonesty" that was material to the cause of action resulting in a final judgment adverse to the director or officer. MD. CODE ANN., CORPS. & ASS'NS § 2-405.2; MD. CODE ANN., CTS. & JUD. PROC. § 5-418. A complaint brought against directors therefore must allege conduct falling under one of these two exceptions to maintain an actionable claim. *See In re Terra Indus., Inc. S'holder Litig.*, No. 24-C-10-001302, 2010 WL 6298746 (Cir. Ct. Md. July 14, 2010) ("Plaintiffs have not alleged or come forward with any evidence that the individual defendants actions fall into the exception, and therefore, the exculpatory clause protects them Plaintiffs' claim for damages").[1]

In *Hayes v. Crown Central Petroleum Corporation*, for example, former stockholders brought breach of fiduciary claims against directors of a Maryland

---

[1] *See also* James J. Hanks, Jr. & Larry P. Scriggins, *Let Stockholders Decide: The Origins of the Maryland's Director and Officer Liability Statute of 1988*, 18 U. Balt. L.Rev. 235, 247 (1989) ("Maryland Statute's two very limited exceptions for improper personal benefit or profit and for active and deliberate dishonesty, stockholders of a Maryland corporation may eliminate the liability of its directors and officers for a broad range of conduct – including not only simple and gross negligence, but also intentional misconduct, bad faith, . . . and violations of law – as long as it does not constitute actual receipt of an improper benefit or profit, or active and deliberate dishonesty . . . . The narrowness and precision of the Maryland Statute's two exceptions make it possibly the most expansive corporate liability limitation statute in the nation.").

company for allegedly causing the company to enter into a merger transaction that was not in its best interests. 78 Fed. App'x 857, 865 (4th Cir. 2003) (*per curiam*). Recognizing the limitations imposed by section 5-418, the Fourth Circuit dismissed the breach of fiduciary claims against the directors. *See id.* The court held that "the plaintiffs have not alleged facts necessary to survive a motion to dismiss their claim against the directors" because the complaint contains no allegations that satisfy one of the exceptions under section 5-418. *Id.*

Here, the Fund's articles of incorporation include a provision limiting the directors' liability:

> To the fullest extent that limitations on the liability of directors and officers are permitted by the [Maryland General Corporation Law], no director or officer of the Corporation shall have any liability to the Corporation or its stockholder for damages.

(RJN, Ex. C at 9–10.)

To meet the exception to the Fund's exculpation clause, Plaintiff must plead facts showing "active and deliberate dishonesty," which the Fourth Circuit has equated to a showing of fraud. *See Hayes*, 78 Fed. App'x at 865 ("As to active or deliberate dishonesty, the plaintiffs cannot prevail because the pleadings specifically exclude allegations of fraud."); *see also CDX Liquidating Trust v. Venrock Associates*, 640 F.3d 209, 216 (7th Cir. 2011) (recognizing *Hayes* as the only decision to define terms under Maryland exculpatory statute).

The TAC contains allegations that the Board generally failed (i) "to fully investigate" the reasons behind the 2008 rights offering; (2) to investigate Stewart

Horesji and the entities relating to the Fund's advisors; and (iii) to invest the funds raised by the 2008 rights offering in accordance with the Fund's investment objectives. (TAC ¶¶ 256-302.) None of these allegations indicate "active or deliberate dishonesty" akin to fraud. The claims against them should be dismissed.[2]

### B. Plaintiff's Allegations Fall Squarely Under the Protection of the Business Judgment Rule

The business judgment rule provides the Court an additional reason to dismiss the claims against the Director Defendants. Under Maryland law, the business judgment rule protects directors from frivolous suits by establishing the legal presumption "that directors act in good faith" performing their directorial duties. *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986).[3] This rule was codified by the Maryland legislature in 1999. *See* MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(e) (providing that "[a]n act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section"). To rebut this presumption, a plaintiff must show the Director Defendants "acted fraudulently or in bad faith." *See NAACP v. Golding*, 679 A.2d 554, 559 (Md. 1996).

---

[2] To the extent that Plaintiff asserts that the TAC pleads a claim for fraud against the Director Defendants, the allegations in the TAC fail to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires a plaintiff alleging fraud to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991)). The TAC plainly does not satisfy this pleading requirement with respect to the Director Defendants. *See Grill v. Hoblitzell*, 771 F. Supp. 709, 712 (D. Md. 1991) (noting that the complaint's "boilerplate allegations [failed to] distinguish among the directors and the roles which they allegedly played in the alleged wrongdoing").

[3] The presumption of good faith is heightened in this case because the majority of Boulder's Board consists of independent outside directors. *Zimmerman*, 800 F.2d at 392 (quoting *Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir. 1981)).

### C. The TAC Does Not State Actionable Claims Against the Director Defendants

#### 1. The TAC Does Not Establish a Failure of Oversight Claim

"Director liability based on the duty of oversight is possibly the most difficult theory in corporate law upon which a plaintiff may hope to win a judgment." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (quoting *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).[4] "Only a sustained or systematic failure of a board to exercise oversight — such as an utter failure to attempt to assure a reasonable information and reporting system exists — will establish the lack of good faith that is a necessary condition to liability." *In re Caremark*, 698 A.2d at 971. "[I]mposition of liability [on this theory] requires a showing that the directors knew that they were not discharging their fiduciary duties." *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006).

Here, the claims against the Director Defendants are focused on their purported failure to: (1) uncover the Fund's co-investment advisers' and co-administrator's purported motives in proposing the 2008 rights offering; (2) cause the proceeds from the 2008 rights offering to be invested in something other than cash equivalents; and (3) investigate beyond the "plausible reasons" provided by the Fund's co-investment advisers to suspend the level-rate distribution policy. (*See* TAC ¶ 259 ("failing to investigate); *id.* ¶ 268 ("failure to invest'); *id.* ¶ 195 (failing to investigate the "plausible

---

[4] *See also In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 873, 879 (D. Md. 2005) (applying *Caremark's* oversight claim standard to Maryland funds); *see also Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 427 (Md. 2009) (explaining that a divergence between Maryland and Delaware law was "a relatively rare rejection in Maryland of Delaware's acknowledged leadership in developing a coherent body of corporate law to which we and many other states ordinarily look for guidance").

{00837298 / 1} - 6 -

reasons" management provided the Board regarding the suspension of shareholder distributions).) Under this type of liability theory brought against directors of a corporation, Plaintiff is required to plead "a sustained or systematic failure of a board to exercise oversight." *In re Caremark*, 698 A.2d at 971.

It is undisputed that the Board conducted its own independent analysis of the benefits and risks with approving the 2008 rights offering and the suspension of the Fund's level-rate distribution policy. The TAC and the attached Report of the Investigation by the Review Committee of the Board of Directors of Boulder Growth and Income Fund, Inc. (the "Final Report") reveal that the Board made considered decisions based on the recommendations and data provided by the Fund's officers and co-investment advisers. (*See, e.g.*, TAC ¶¶ 83-87 (2008 rights offering approval process); *id.* ¶¶ 117-19 (suspension of level-rate distribution policy approval process); *id.* Ex. L at 22-46 (2008 rights offering and suspension of level-rate distribution policy approval process).)[5] The Director Defendants were entitled to rely on this information, as Maryland law states that directors may rely "on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or

---

[5] Plaintiff's allegation that the Board "rubber stamped" proposals by management is the prototypical conclusory allegation rejected by the courts. *See Kenney v. Koenig*, 426 F. Supp. 2d 1175, 1182 (D. Colo. 2006) (plaintiffs' "claim must fail if '[a]ll of the allegations of serious misconduct on the part of the directors are stated conclusorily [sic], without specification of particular personal acts or conduct to sustain the asserted conclusions.'"). Further, Plaintiff's assertion is inconsistent with well-established law that directors are allowed to rely on the advice of management without facing liability. *See* MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(b)(1) & (ii).

presented by" management or expert advisers. *See* MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(b)(1) & (ii).[6]

As a result, Plaintiff alleges that the Director Defendants "should have known" that the motives of the co-investment advisers' recommendations were not in the best interests of the Fund. (TAC ¶ 253.) But the Directors Defendants' "duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise." *Id.*[7] "[A]bsent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963). Thus, even assuming that the allegations pertaining to the Fund's co-investment advisers and co-administrator are true, the TAC does not offer a single allegation that would raise a red flag putting the Director Defendants on notice. To the contrary, Plaintiff's allegations state that the Board was not on notice of any allegedly improper conduct. (*See, e.g.*, TAC ¶ 84 (alleging that the Board was unaware of the Fund's co-investment advisers and co-administrator motives).) Plaintiff's claims against the Director Defendants should be dismissed.

---

[6] The Board also engaged an independent adviser in connection with the Fund's 2007 rights offering, which was concluded several months before the 2008 rights offering was proposed. (TAC ¶ 201 n.14.) As the Final Report explains, the Board consulted the independent adviser again in connection with the 2008 rights offering, "but on an informal, as needed basis." (*Id.*, Ex. L at 35.)

[7] *See also Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) ("courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."); *In re IAC/InterActiveCorp.*, 478 F. Supp. 2d 574, 605 (S.D.N.Y. 2007) ("no rationally designed system of information and reporting 'will remove the possibility that the corporation will violate laws or regulations.'").

### 2. The Board Prudently Exercised its Business Judgment By Allowing the Advisers to Invest In Cash Equivalents

Plaintiff's second theory of liability against the Director Defendants is based on the Fund's alleged investment in cash equivalents after the 2008 rights offering. (TAC ¶¶ 259, 267.) Plaintiff alleges that this investment was inconsistent with the Fund's investment objective and led to a decrease in the Fund's share price. (*Id.*) Putting aside the fact that the Fund won the Lipper Award for outperforming its peers in 2008 as a result of its prudent investment decisions, *see id.* Ex. L at 46, Plaintiff's claim is a quintessential challenge to a Board's business judgment (*i.e.*, attacking the substance of the Board's decision rather than the process).

To begin with, Plaintiff's fundamental premise is false – the Fund invested consistently with its investment objectives. It cannot be dispute that the world economy nearly collapsed after the 2008 rights offering was completed. *See Meyer v. St. Joe Co.*, No. 5:11–cv–27/RS–EMT, 2011 WL 3750324, at *10 (N.D. Fla. Aug. 24, 2011) ("In the midst of the financial meltdown, Defendants cannot be held to a prescient standard to know how the market would behave to affect the future value of their holdings."). Under these circumstances, the Fund's stated objectives expressly allow the Fund to adjust its investment strategy to account for changing market conditions, stating: "The Fund may, for temporary defensive purposes, allocate a higher portion of its assets to cash and cash equivalents." (*See* RJN, Ex. B at 12.) Consistent with the stated objectives, the Fund invested in cash equivalents for defensive purposes when the global markets started to decline in 2008. (TAC ¶ 135 ("Most of the rights offering

proceeds were invested in defensive, cash or cash-equivalent positions, prior to or during the worst months – October and November [of 2008].").)  Such conduct is far from active and deliberate dishonesty required for a claim of fraud.  *See Nails v. S & R*, 639 A.2d 660, 668–69 (Md. 1994) (enumerating elements of fraud claim).

In addition, Plaintiff's contention is contrary to guidance provided by the SEC for funds governed under the Investment Company Act of 1940.  After a closed-end investment fund receives significant amount of proceeds from an offering, there is no reasonable expectation that all proceeds from an offering will be immediately invested in non-cash equivalents.  Indeed, investment companies are expressly permitted by the SEC to invest heavily in cash equivalents after receiving "large cash inflows or redemptions."  Investment Company Act Release No. 24828, 74 SEC Docket 313, 2001 WL 40364 at *6.  The SEC has even singled-out closed-end funds, stating that they are entitled to greater flexibility than other investment companies after an offering.  *Id.* at *6 n.40 (noting that "it may be appropriate for a closed-end fund that invests in securities whose supply is limited to take longer than six months to invest offering proceeds.").  Here, Plaintiff does not allege when or how long the Fund invested proceeds from the 2008 rights offering in cash equivalents, let alone that the Fund took an unreasonable amount of time to do so.  (*See generally* TAC.)  Plaintiff simply disagrees with the business judgment to invest in cash equivalents during a time of rapid market decline.

### 3. The Board's Decision to Suspend Stockholder Distributions In Light of an Agreement with the SEC Was a Proper Exercise of the Board's Business Judgment

On November 11, 2008, the Fund announced the suspension of the Fund's level-rate distribution policy. (TAC ¶ 123.) The announcement listed a number of reasons that the Board decided to suspend the policy. (*Id.*, Ex. L at 42.) The TAC admits these were all "plausible" reasons for the Board's decision. (*Id.* ¶ 195.) Plaintiff further acknowledges that the Board decision was primarily based on the Fund's "agreement with the SEC to attempt to conform distributions to Boulder's five year rolling return." (*Id.* ¶ 220.)

The decision to suspend the Fund's level-rate distribution policy was a business decision for the Board. (*See* Rpt. Tr. at 25:24-25 (Apr. 13, 2011) (Plaintiff's counsel admitting that the investment in cash equivalents as a "business decision").) Plaintiff provides no allegations that challenge the Board's business judgment other than claiming that it "rubber stamped" the proposal by the Advisers. (TAC ¶ 276.) But as noted above, the TAC does not attempt to allege a "systematic failure of the board to exercise oversight." *Caremark*, 698 A.2d at 971.

Plaintiff also alleges that defendant "Looney's statement about suspending the distribution policy to comply with the SEC guideline clearly contradicts Boulder's track record." (TAC ¶ 127.). To establish this purported contradiction, Plaintiff points to the distributions from August, September, and October of 2008 and notes that the distributions represented a higher percentage of net asset value ("NAV") than the

Fund's trailing five year annualized return on NAV. (*Id.*)[8] But this example does not prove a misstatement; rather, it demonstrates why the Director Defendants opted to suspend the distributions. In fact, the Fund's press release announcing the suspension specifically lists this increased percentage of NAV (caused by the economic downturn) as one of the reasons that the Board decided to suspend the distribution policy: "Recent market declines have caused the distribution rate under the Policy to increase dramatically relative to net assets." (*Id.*, Ex. L at 42.) Contrary to Plaintiff's suggestions, the Fund, at all times, provided accurate statements to stockholders and investors.[9] These facts demonstrate that the Board became aware of facts that would put the Fund in potential breach of their agreement with the SEC, and therefore exercised its business judgment to suspend the level-rate distribution policy.

The TAC alleges that improper benefits were received **by the Advisers** from the proceeds received in the 2008 rights offering and from the suspension of distributions. (*Id.* ¶ 301.) Plaintiff never explains, with any particularity, when or how these fees were *actually* received by the Director Defendants (or any of the other directors). *See Gurvey v. Cowan, Liebowitz & Latman, PC.*, No. 06 Civ. 1202(BSJ), 2009 WL 1117278, at *8 (S.D.N.Y. Apr. 24, 2009) (dismissing claim because "Plaintiff has provided only assertion and speculation as to the benefit that was taken from her by Defendants"); *see also Harte–Hanks Direct Mkt. v. Varilease Tech.*, 299 F. Supp. 2d 505, 520–21 (D.

---

[8] Plaintiff alleges that the Fund had obligations that never existed. The Fund's agreement with the SEC was not reached until mid-2007. (TAC, Ex. L at 29-30.) Plaintiff's assertion that the Fund was not in conformity with the SEC agreement in 2006 or 2007 is therefore not accurate. (*Id.* ¶ 223.)

[9] Notably, Plaintiff's assertion is based only "on information and belief", and thus is without factual support to overcome the business judgment presumption. (TAC ¶ 221.)

Md. 2004) (dismissing an unjust enrichment claim where the plaintiff did not allege the defendant received any benefit). More importantly, the Plaintiff cannot establish that such fees were improper. *See Brown v. Calamos*, --- F.3d ----, 2011 WL 5505375, at *7 (7th Cir. Nov. 10, 2011) (holding that the "the fact that management profits from an increase in the size of [a closed-end fund] is not a breach of its duty of loyalty to shareholders"). As explained above, Plaintiff's entire theory of liability rests on the incorrect assumption that the motive of the Advisers is automatically imputed onto the actions of the directors.[10]

Moreover, the advisory fees were established through an industry standard contract, which tied the advisory fees to the amount of assets under management. (TAC ¶ 55.)[11] This arrangement enabled the Fund to incentivize successful investments, *i.e.* increasing assets under management. Increasing the amount of assets under management was not only a legitimate corporate purpose, but also a recognized goal of the Fund. (*See* RJN, Ex. D at 20 (Fund's website stating that it intended to increase NAV through conducting multiple rights offerings.) Thus, the TAC's conclusory allegations fail to state a claim of actual receipt of improper benefits. *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ 318, 2009 WL 2242605, at *40

---

[10] Plaintiff's alleged theory that there was a breach of fiduciary duty by temporarily investing in cash equivalents that purportedly under-earned the Fund's expense ratio leads to the absurd result and contrary to the guidance provided by the SEC. This would mean that any temporary investment in cash equivalents puts the investment company's directors in breach of their fiduciaries.

[11] Since a contract exists between the parties concerning the same subject matter on which the unjust enrichment claim rests, any claim in law or in equity is foreclosed by Maryland law. *See County Com'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 607, 96 (Md. 2000) ("It is settled law in Maryland . . . that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.")).

(S.D.N.Y. July 27, 2009) (holding that the plaintiffs' allegations failed to support that the defendants were improperly "enriched at the Plaintiffs' expense").

## III.     CONCLUSION

For the reasons set forth above, the Director Defendants respectfully request that the Court dismiss all claims asserted in the TAC.

Dated:  December 16, 2011

                                              /s/ Bruce Montoya

                                              Bruce A. Montoya
                                              Edward J. Hafer
                                              MESSNER & REEVES, LLC
                                              1430 Wynkoop Street, Suite 300
                                              Denver, CO  80202
                                              Telephone: (303) 405-4192
                                              Fax: (303) 623-0552
                                              bmontoya@messner.com
                                              ehafer@messner.com


                                              *Attorneys for Defendants Susan L. Ciciora and John S. Horejsi*

## **CERTIFICATE OF SERVICE**

I certify that on this 16th day of December, 2011, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS SUSAN L. CICIORA'S AND JOHN S. HOREJSI'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 8(a), 9(b), and 12(b)(6) )** was filed and served via CM/ECF on all registered participants as identified on the Notice of Electronic Filing:

Daniel Scott Carlton -- scottcarlton@paulhastings.com

Joshua G. Hamilton -- joshuahamilton@paulhastings.com

William F. Sullivan -- williamsullivan@paulhastings.com

Jeffrey P. Harris -- jharris@statmanharris.com

Brian Thomas Giles – bgiles@statmanharris.com

Christian Heath Hendrickson -- chendrickson@shermanhoward.com

Rusty Evan Glenn -- rusty@shumanlawfirm.com

Kip Brian Shuman -- kip@shumanlawfirm.com

Michael Ross MacPhail -- michael.macphail@hro.com

Nicole R. Serfoss – nserfoss@mofo.com

Judson Earle Lobdell – jlobdell@mofo.com

Jordan D. Eth – jeth@mofo.com

Laura Stacey Perlov - laura.perlov@hro.com

Randall J. Fons - rfons@mofo.com

                                            *s/ Jeanine A. Montoya*
                                            Jeanine A. Montoya